MINNA SCHRADER, RESPONDENT, v. WESTPORT AVENUE BANK, A CORPORATION, APPELLANT.—156 S. W. (2d) 753.

Kansas City Court of Appeals. December 1, 1941.

*Beach, Gordon & Beach* for appellant.

*Kenneth I. Fligg* and *Warren E. Slagle* for respondent.

*Lombardi, Robertson, Fligg & McLean* of counsel.

BLAND, J.—This is an action for the conversion of certain non-negotiable debentures issued by the Community Telephone Company. Plaintiff recovered a judgment in the sum of $3440, and defendant has appealed. Defendant pleaded defenses, equitable in nature, and moved that the suit be transferred to the equity docket. This was done, and the case was tried, without objection, as one in equity.

The facts show that plaintiff, for a number of years prior to the month of December, 1936, owned eight one thousand dollar bonds of the Trinity Lutheran Hospital Association; that for sometime prior to the month of December, 1936, she had been acquainted with one, Wilson E. Tucker, who had purchased for her some Gary Telephone stock in the years of 1932 and 1933; that he also managed three or four farms for her; that her relations with him were such that she had confidence in his ability and integrity; that in December, 1936, Tucker was engaged in the brokerage business, and was associated in that business with Prugh, Combest and Land, security brokers, in Kansas City; that Tucker advised plaintiff to sell her Trinity Lutheran Hospital Association bonds and to purchase Community Telephone Company debentures and, with her authority, Tucker sold her bonds and purchased nine Community Telephone Company debentures of the par value of $8000. These latter bonds are the ones involved in this proceeding. Prugh, Combest and Land caused the Commerce Trust Company, the transfer agent of the Community Telephone

Company, to transfer to plaintiff's name, upon the records of the issuing company, the Community Telephone debentures. This was done on December 11, 1936. These debentures or bonds were pledged on December 30, 1936, to the defendant bank in Kansas City by Tucker as additional collateral for two loans of his with the bank totalling $2500. When he pledged them he withdrew other securities and delivered the bonds, together with nine blank assignments clipped together and purporting to have been signed by the plaintiff. These blank assignments were those in general use by brokers and banks in Kansas City in the transfer of securities. In addition to being blank assignments they were also blank powers of attorney, authorizing the persons, whose names were to be inserted therein, to transfer the bonds on the books of the company issuing them. The principal contention at the trial was whether plaintiff actually signed the blank assignments and powers of attorney.

Plaintiff and her daughter testified that Tucker did not deliver the bonds in question to plaintiff; that he gave various excuses for not doing so; that he told the plaintiff that the "government was changing too many things. . . . The government is not through with them and he couldn't get the papers; . . . that the corporation was being revamped and that he couldn't get the securities. There was quite a bit of readjusting in the business;" that "his plausible excuse was that there was so much red tape connected with their readjusting;" that he told her "various stories;" that this continued for a period of a year and a half or more.

However, there appears in the record a receipt, dated December 11, 1936, for the bonds in question, purporting to have been signed by the plaintiff. At the trial plaintiff acknowledged that she signed this receipt, and did not explain the apparent discrepancy between that act and her testimony. Plaintiff employed an attorney and it was then for the first time, discovered that the bonds had been deposited with the defendant by Tucker as collateral security for his loans.

Plaintiff testified at the trial that she not only had not seen the bonds but that she did not sign any of the blank assignments and powers of attorney; that her purported signature to them was not hers. Her deposition was taken sometime before the trial and apparently all nine of the blank assignments, purporting to bear her signature, were shown to her. She was questioned in her deposition concerning them. She was handed one of them and when asked if the signature to it was actually hers, she replied in the affirmative; that she could not say when she signed it; that she was leaving for Europe and that Tucker told her not to worry and that when she came back he would have the papers and give them to her. (No explanation was offered at the trial for the discrepancy between this testimony and that sworn to by plaintiff at the trial.)

Plaintiff further testified in her deposition: "Q. Did he say he would sell them for you? A. Yes, he did. Q. (Interrupting): Was he supposed to sell those bonds for you? A. No, no, no. Q. He never was supposed to sell those bonds? A. No, and I never seen them. Q. Well, why did you sign this endorsement in blank (indicating Exhibit 'A')? A. Well, it was told me that I had to, and of course, I trusted him just like I trust Mr. Fligg, now, to sign things, and I signed them. Q. Did he explain to you why he wanted it signed? A. Well, he said he had to do that, to make the sale, *to get the papers*. Q. To make the sale? Was he supposed to sell these for you? A. No, *to get them*. Q. Well, what were you going to do with them—were you going to keep them? A. Yes, sir"; (italics ours). She further testified in her deposition that she signed only one of the assignments and did not remember signing any more than one; that she read the one she signed and noted that it recited: "I hereby sell, assign and transfer unto ————;" that she understood what that meant: "Q. And you signed and turned those over to him? A. Well, to come right down to it, I never have seen that paper (indicating Exhibit 'A'). Q. You didn't even look at it? A. No, I never have seen this paper. Q. That is your signature, though? A. I doubt that it is my signature. Q. How? A. I never have seen this paper (indicating Exhibit 'A'). Q. Well, is that your signature, or is it not? A. Well, it is very close to it, but I doubt it, that I ever—Q. (Interrupting): Well, you said awhile ago it was your signature? A. Yes, but I never seen this paper (indicating Exhibit 'A'). I never seen that bond (indicating) and I never saw that paper (indicating) until today."

Plaintiff's daughter, testifying for her, was shown the former's purported signatures upon the blank assignments and powers of attorney. She stated that the signatures appearing thereon resembled that of the plaintiff, but that she did not know whether they were her signatures.

Defendant introduced, as a witness, a handwriting expert, who compared the signatures on the blank assignments with various other admitted signatures of plaintiff and he testified that the signatures on the blank assignments were the same as the admitted signatures.

Tucker, testifying for the defendant, stated, that after he purchased the Community Telephone Company bonds for the plaintiff he discovered that they were not as good an investment as he had thought; that he advised plaintiff to sell them; that she authorized him to sell them and to invest the money in something else, leaving the selection of the investment to the witness; that he intended to sell the bonds and reinvest the money but before making the reinvestment he expected to consult plaintiff; that plaintiff delivered the bonds to him but that, instead of selling them, he placed them with the defendant bank on December 30, 1936, as collateral to secure existing loans

of his at the bank; that he did not indicate to the bank that the bonds were not his. He testified that he delivered the bonds to plaintiff after they were registered in her name; that she executed the assignments in his office about Christmas time, 1936; that he signed them as a witness to her signature.

As before stated, the court rendered a decree in favor of plaintiff in the sum of $3440, which was the market value of the bonds at the time defendant took them from Tucker as collateral security for his loans. At the time the bonds were demanded by plaintiff's attorney from the defendant, in the month of June, 1938, they had depreciated in value to such an extent that they were worth only $640.

The chancellor made certain finding of facts and incorporated them in his decree. Among other things, the decree recites: "The Court finds that the pledging of the said Community Telephone Company income debentures with the Westport Avenue Bank by W. E. Tucker was without the knowledge or consent of the plaintiff, Minna Schrader, and that Minna Schrader did not *voluntarily* execute and deliver to Tucker the assignments purporting to transfer the title to said debentures." (Italics ours.)

The defendant contends that the court erred in rendering a decree for the plaintiff for the reason that plaintiff signed the endorsements in blank leaving them and the bonds with Tucker; that she thus made it possible for Tucker to secure defendant's acceptance of the bonds as collateral security for his loans and that the loss occurred through the carelessness or neglect of plaintiff or her misplaced confidence in Tucker and, it is contended that, under such circumstances the plaintiff is estopped to set up her title against the bank. In this connection defendant seeks to apply the rule that when one of two innocent persons, that is, persons each guiltless of an intentional, moral wrong, must suffer a loss, it must be borne by that one of them who by his conduct has rendered the injury possible.

"Another exception to the rule, that the owner of personal property cannot be divested of his title without his consent, is, where the owner, by his voluntary act, has conferred upon another, under whom an honest purchaser claims, the apparent right of ownership and disposal of his property; and this holds, although the owner may have been deceived and imposed upon, in bestowing this right of ownership and disposal. . . . The law protects the honest purchaser where the owner, although induced by fraud or mistake, has voluntarily given to another the apparent right of property or sale. But if the owner loses his property or is robbed of it, or if it is stolen from him, or if it is sold or pledged, without his consent, by one who hired it or to whom it is loaned, or who has it in his possession for transportation or for mending or repairing it—in all these cases, the owner may reclaim his property wherever found, however innocent the person may be to whose possession it may be traced,

and whatever consideration he may have given for it." [DePew v. Robards, 17 Mo. 580, 582, 583. See, also, Lee v. Turner, 89 Mo. 489; Lawless, et al. v. Guelbreth, 8 Mo. 139; The International Bank v. The German Bank, 71 Mo. 183; Am. Employers Ins. Co. v. Manufacturers Bank, 85 S. W. (2d) 174.]

"The fact that a stock-broker in pledging securities belonging to his customer breaches his duty to his customer does not necessarily mean that the pledgee from the broker cannot retain such securities until repaid the amount due him for which the securities were pledged. As between such third person and the customer the question is one of good faith and equitable estoppel. If the broker has been clothed with an indicia of title as where the customer entrusts the broker with stock certificates indorsed in blank, places in the hands of a broker stock bearing a blank assignment and power of attorney to transfer the same on the books of the corporation or delivers certificates of stock indorsed in blank, to be used as collateral to secure any balance due on his account, or permits the broker to retain possession of stock purchased on margin, and the broker wrongfully pledges such stock or securities to another for a greater amount than his lien thereon who in good faith advances money to the broker, the owner will be estopped from maintaining his title to the stock and must bear the loss.

"He cannot redeem it by paying what the broker owes. If, however, the pledgee of the broker has notice of the lack of authority or title of the broker or of the limitations on his authority, or has knowledge of facts sufficient to put him on notice that the broker is exceeding his authority, he is jointly liable with the broker for the wrongful act of repledging the stock." [8 Am. Jur., pp. 1030, 1031. See, also, 19 Am. Jur., pp. 698, 699, 700; 10 R. C. L., p. 695; 24 R. C. L., pp. 378, 379; Citizens Bank v. Mut. Trust & Dep. Co. (Ky.), 266 S. W. 875; National Safe Dep. Co. v. Hibbs, 229 U. S. 391; Austin v. Hayden, 171 Mich. 38; Johnson v. Bixby, 252 Fed. 103.]

However, plaintiff says that the situation in this case is no different than if the bonds had been stolen. The authorities we have cited, *supra*, distinguish between cases where the possession of the chattels or securities have been obtained by theft or other criminal act, such as taking possession without the owner's consent and, on the other hand, where the owner voluntarily has parted with the possession of the chattel, though induced to do so by means of a criminal act. In the first instance possession has been obtained without the owner's consent, whereas, in the second instance, possession has been obtained by the owner's voluntary act. This distinguishment is made clear, not only in the cases we have cited but, in Goddard Grocer Co. v. Freeman, 127 S. W. (2d) 759.

However, plaintiff says that the evidence shows that she did not execute the assignments in question and that the court so found.

The language used in the decree is that "Minna Schrader did not *voluntarily* execute and deliver," etc. (Italics ours.) We are of the opinion that the court did not mean to say that plaintiff did not sign her name to these assignments in the fact of the overwhelming testimony that she did. However, plaintiff says: "If the so-called blank assignments were not forged, but were signed by the respondent, no one but Tucker knows when she signed them, or the circumstances under which she signed them. She testified positively at the time her deposition was taken, and at the trial of this cause, that she never saw the assignments or the debentures until they were exhibited to her when her deposition was taken in this suit. Only Tucker knows the trick or scheme by which he induced her to sign her name if she did sign her name. Under such circumstances there never was any execution and delivery of an assignment, since a condition precedent to the making of such an instrument is the presence of the voluntary consent of the party undertaking to make the same."

In one place in her deposition plaintiff said that she read the assignment. In another she said that, while she signed it, she did not see it. No explanation was attempted anywhere as to the discrepancy in these statements.

There is evidence that the bonds in question, after having been registered by Tucker, were not delivered to plaintiff, although the receipt that plaintiff admittedly signed for the bonds, and Tucker's testimony, indicate that they were. Tucker's testimony on the subject, plaintiff contends, is not consistent, in that, at one place in his testimony, plaintiff says, he stated that he told plaintiff various stories as to why he was unable to deliver the bonds to her. However, we find that, he testified that he talked to her before she went to Europe as to whether he had done anything with the bonds. It is to be inferred that he told her that he had not sold them and gave various excuses for not returning them to her. Be that as it may, there is no question in our minds, but that plaintiff signed the blank assignments, although she contradicted Tucker's testimony as to why she did so. Plaintiff's testimony is not very clear as to why she signed them (or one of them) but it may be inferred that she did so on the representation of Tucker that it was necessary for her to execute them in order for them to get the bonds, which he represented he had not been able to procure. It will be noted that in her deposition, she stated that she signed "Exhibit 'A,'" being one of the blank assignments "*to get the papers.*" This, undoubtedly, referred to the bonds. However, the fact, if it be a fact, that Tucker misrepresented to her his reason for desiring the assignments, does not prejudice the rights of defendant to the securities, under the circumstances. [DePew v. Robards, *supra*; Goddard Grocer Co. v. Freeman, *supra*; Gen. Motors Accep. Corp. v. Holland, 30 S. W. (2d) 1087.]

The burden is upon the party asserting fraud to prove it. [Sheppard v. Travelers Protective Ass'n of Am., 124 S. W. (2d) 528; Greene v. Spitzer, 123 S. W. (2d) 57.]

If Tucker was guilty of some trick or scheme by which he induced plaintiff to sign her name by substitution of papers or the like, it was incumbent upon plaintiff to show it, which she failed to do. There is no evidence that Tucker misrepresented the contents of the assignments and powers of attorney, but merely the use to which he intended to put them. Whether fraud in the *factum*, would have made any difference, under the facts of this case, it is unnecessary for us to say, for, of course, no such fraud was shown. It therefore makes no difference whether plaintiff read the assignments when she signed them unless her negligence in failing to read them has a bearing on the matter.

While, it is true, the appellate courts, ordinarily, adhere to the finding of the chancellor in matters of this kind, where the evidence is in conflict, however, as we view it, there is no evidence of fraud in this case, within the meaning of the law in such matters such as to invalidate the assignments.

However, plaintiff claims that defendant was grossly negligent in taking the bonds and the assignments as collateral security for the loans of Tucker.

The facts in this connection show that Tucker had been a customer of the defendant for 25 years; that he had borrowed money from it off and on for some 15 years; that during the eight years preceding 1936, he had ordinarily transacted his business with Mr. Ricketts, defendant's vice-president; that he had obtained at least a dozen loans from the defendant, all secured by stocks and bonds; that Tucker always kept his loans in good shape; that all of his prior loans had been paid at the time the bonds in question were pledged to the bank. It is true, that Tucker did not indicate directly to the bank that he owned the bonds, yet, since the bank knew Tucker favorably it naturally did not ask him any such question as whether he owned the bonds in accepting them as collateral. However, the bank did check plaintiff's signature against a signature card of plaintiff which the bank had on its records, she having had a time deposit with it for two years prior to November, 1936. The defendant had often accepted from Tucker, as collateral, for loans it made him, securities in the name of third persons, to which assignments were attached. The evidence shows that he had no trouble substituting one security for another. Sometimes he would talk about it before with Mr. Ricketts, but as a rule he would get the new securities and leave them with Mr. Ricketts and take his old securities away. The bank did not keep any record of the names of the registered owners of these securities. When Tucker pledged the bonds in question defendant took them without asking anything concerning the identity of Minna Schrader and without making any attempt to get in touch with her by telephone.

The assignments were not filled out. The assignments were the usual and accepted means of transferring title in the form in which they appeared in this instance. Such title would be transferred from person to person without registration of the bonds with the transfer agent.

The evidence shows that the forms were not filled out by the defendant until after demand had been made upon it by plaintiff's attorney for the possession of the bonds. However, the evidence on behalf of defendant, and undisputed, tends to show that it was the practice not to fill in the blanks until the indebtedness became due and unpaid and the bank desired to have the securities registered in its name. In order to have this done it was necessary, of course, to fill in the blanks. The evidence shows that at the time the blanks were filled in in this instance Tucker's loans were over due. As before stated, the evidence shows that the signed forms taken by the bank in this instance were the usual and accepted means of transferring title to registered bonds. It also shows that while security brokers in Kansas City require that the signature of the assignor on a bond assignment be guaranteed by a bank or trust company, or a security brokerage company, for the purpose of verifying the signature of the assignor, yet, the banks in Kansas City, generally, in making loans on registered bonds, require a guaranty of the signature of the assignor only when the signature of the assignor, the witness and the customer submitting bonds as collateral are unknown to the bank, or when a husband seeks to make a loan on securities held in his wife's name or *vice versa.*

Under all of the circumstances, we fail to find any evidence of neglect on the part of the defendant in accepting the bonds in question as collateral. There was nothing about the transaction to put the bank on inquiry relative to the right of Tucker to pledge the bonds.

Plaintiff calls our attention to the fact that the bonds had endorsed upon them information to the effect that no transfer thereof should be valid unless made on the books of the company issuing them kept at the Commerce Trust Company, the transfer agent; that the company and the transfer agent might treat the person in whose name the bonds were registered as the absolute owner thereof for the purpose of receiving payment of the principal and interest and for all other purposes whatsoever, and neither the company issuing the bonds nor the transfer agent should be affected by any notice to the contrary.

However, this provision was for the protection of the company and the transfer agent. It shed no real light upon the manner of acquiring title between the parties negotiating the bonds. "It has also been settled, by repeated adjudications, that, as between the parties, the delivery of the certificate, with assignment and power

endorsed, passes the entire title, legal and equitable, in the shares, notwithstanding that, by the terms of the charter or by-laws of the corporation, the stock is declared to be transferable only on its books; that such provisions are intended solely for the protection of the corporation, and can be waived or asserted at its pleasure, and that no effect is given to them except for the protection of the corporation; that they do not incapacitate the shareholder from parting with his interest, and that his assignment, not on the books, passes the entire legal title to the stock, subject only to such liens or claims as the corporation may have upon it, and excepting the right of voting at elections." [McNeil v. The Tenth National Bank, 46 N. Y. 325, 331. See, also, Citizens' Bank v. Mutual Trust & Deposit Co. (Ky.), 266 S. W. 875.]

The judgment is reversed. All concur.

## ON REHEARING.

BLAND, J.—We have again carefully examined the briefs and the record in this case and have concluded that the result reached on the original submission was correct. Therefore, we adopt the opinion of the court rendered at that time, with the exception of the statement contained therein, that the case was tried, without objection, as one in equity.

On a re-examination of the record we find that there was an objection made by the plaintiff to the action of the court in transferring the cause to the equity docket. However, assuming that the case is one not for equitable jurisdiction, but should have been tried as a law case, plaintiff is in no position to complain. [Reid v. Brotherhood of Railroad Trainmen, 232 S. W. 185.]

The judgment is reversed. All concur.