203 So.2d 39 (1967)
SOUTHEAST FOODS, INC., Appellant,
v.
PENGUIN FROZEN FOODS et al., Appellees.
PENGUIN FROZEN FOODS et al., Appellants,
v.
NATIONAL FREEZERS, INC., et al., Appellees.
Nos. 66-988, 66-1019.
District Court of Appeal of Florida. Third District.
September 26, 1967.
Rehearing Denied November 1, 1967.
Heiman & Crary, Myers, Kaplan & Porter, Miami, for National Freezer and Southeast Foods.
*40 Fowler, White, Gillen, Humkey & Trenam and Harold L. Ward, Miami, for Penguin Frozen Foods.
Before PEARSON, BARKDULL and HENDRY, JJ.
HENDRY, Judge.
The plaintiff below, Penguin Frozen Foods, instituted suit against the defendants, Southeast Foods, Inc., and National Freezers, Inc., on the basis of a nonnegotiable warehouse receipt through which Penguin claimed ownership of some fifty-one thousand, nine hundred and twenty-five pounds of frozen shrimp. The trial court, sitting without a jury, rendered judgment in favor of Penguin as against Southeast; however, regarding that portion of the action against National, the trial court ruled against Penguin and in favor of National. Appeal No. 66-988 is an appeal by Southeast from that part of the final order which grants judgment in favor of Penguin against Southeast. Appeal No. 66-1019 is an appeal by Penguin from that portion of the final order granting judgment in favor of National.
In order to give a clear understanding of the complexity of the transactions and circumstances giving rise to the litigation below, we shall set out those particular paragraphs of the trial court's "Finding of Fact" which are most relevant to the issues here on appeal.
"FINDINGS OF FACT"
"(c) That Penguin is in the business of buying and selling frozen shrimp from producers and/or importers thereof and selling the same to its customers, who are both wholesalers and retailers. On or about April of 1964, Penguin had furnished Marine Garden, Inc. (hereinafter called `Marine Garden') with a letter of credit whereby, in the event Penguin and Marine Garden should agree upon sales of shrimp from the latter to the former, an expeditious means of payment from Penguin to Marine Garden might be effected; under the letter of credit, and for the purpose of protecting Penguin, payment to Marine Garden was conditioned upon presentment to the local bank in Miami of documents of title evidencing the vesting in Penguin of the title to the shrimp involved in any such transaction.
"(d) That with respect to the dealings and relationship between Marine Garden and Penguin, at all material times, there is no credible evidence that such relationship was anything other than vendorvendee; neither party exercised any control in respect to the business affairs of the other party; Penguin had no control over or voice in any shrimp purchased or acquired by Marine Garden that might thereafter be sold by Marine Garden to Penguin, nor did Marine Garden, subsequent to any such sale of shrimp by it to Penguin, exercise any control over Penguin's resale thereof to its own customers. There is no credible evidence to support any finding that with respect to any such resale by Penguin, in the event the same should have to be sold at a loss, Marine Garden would have been obliged to share in such loss; once Penguin acquired title to the shrimp by virtue of purchasing the same from Marine Garden, the latter thereafter had no interest of any nature in such shrimp.
"(e) On June 29, 1964, defendant Southeast owned or had the right to sell a quantity of shrimp stored with National; on that date Southeast, through two of its officers, Bailey and Creasman, entered into an agreement with Marine Garden, whose President was Ricardo Nevarez, whereby Marine Garden agreed to purchase a quantity of the aforesaid shrimp for a price of $54,717.25, and Southeast promised to sell the subject shrimp to Marine Garden for such amount.

*41 "(f) That Southeast instructed National to issue a non-negotiable warehouse receipt in the name of Penguin; this National did, and the salient provisions of that receipt read as follows:
 `Original-Non-Negotiable Warehouse Receipt
 NATIONAL FREEZERS, INC.
 * * *
 `This is to certify that we have received from Date
 EX TR FR Marine Midland D.T. #60185 TR FR 6/29/64
 Southeast Foods, Inc.D.T. #60187 For
 Account of: PENGUIN FROZEN FOODS
 120 LaSalle Street
 Chicago, Illinois
 * * *
"This receipt was delivered by National to defendant Southeast on Monday, June 29th, at or shortly after the issuance of the receipt, as aforesaid.
"(g) That on the following day, Tuesday, June 30, 1964, Southeast delivered said warehouse receipt to Nevarez, President of Marine Garden, said delivery being accomplished by Bailey and Creasman, officers of Southeast.
"(h) Bailey and Creasman, as representatives of Southeast, did not trust Nevarez and, in fact, testified that they were aware of his `bad reputation' but, nevertheless, permitted Nevarez to have possession of the warehouse receipt, knowing that he could utilize said receipt to obtain cash from Penguin through the local bank on the basis of the letter of credit.
"(i) Bailey and Creasman, despite their knowledge that Nevarez could use said receipt to obtain payment from Penguin for the shrimp through a local bank, and notwithstanding their knowledge of Nevarez'a unsavory reputation, nevertheless, left Nevarez's office on the afternoon of June 30th and permitted Nevarez to retain in his possession the said receipt. Furthermore, at the close of business on June 30th, Creasman knew that all documents, including the receipt, had been delivered to a local bank for the purpose of obtaining payment and did nothing to safeguard the payment or protect the money, despite his knowledge of the bad reputation of Nevarez.
"(j) Penguin had no knowledge whatsoever of Southeast's involvement in the transaction until a time subsequent to the occurrences material to the issues of this proceeding and, at all times, believed that it was dealing solely with Marine Garden, as vendor of the shrimp to Penguin.
"(k) On the afternoon of June 30th, Penguin, for the purpose of verifying the quality of the shrimp, arranged for an inspection thereof by a local seafood dealer, Gorton's. National concedes that in purchases of this type, where the buyer is many miles distant from the scene of the transaction, such inspection is customary. Furthermore, on the afternoon of June 30th, Penguin, in order that it might immediately commence withdrawals of the shrimp from the warehouse for the purpose of beginning sales and distribution of same to its customers, telephoned National long-distance and inquired whether National then held the shrimp for Penguin's account, and National advised and instructed Penguin that the warehouse receipt had been issued in the name of Penguin.

*42 "(l) On or about 11:30 o'clock a.m. Wednesday, July 1, 1964, Penguin, through First National Bank of Miami, pursuant to the letter of credit referred to herein, paid the sum of $47,973.07 in cash to an agent of Marine Garden, the delay in payment from the afternoon of June 30th to the morning of July 1st being attributable to the First National Bank of Miami's desire to clear certain procedural details with the Chicago bank on whom the letter of credit was drawn.
"(m) The bank, thereupon, transferred all documents, including the warehouse receipt, to Penguin, who has held and possessed same ever since.
"(n) Meantime, at the beginning of business on Wednesday, July 1, 1964, both Bailey and Creasman again presented themselves at Nevarez's office, expressing concern, and once more demanding payment, but Southeast again took no action to protect itself, and shortly thereafter Nevarez disappeared from his office, appropriated the money to his own use, skipped town, and was not found for sometime thereafter. Creasman, on learning of the sudden departure of Nevarez, in a letter dated July 1, 1964, and delivered to National on that date, advised National of cancellation of the transfer order on June 29, 1964 (which order directed National to issue the receipt) covering the subject frozen shrimp and ordered that no delivery of this merchandise be made until further notice. National was never advised prior to the receipt of this letter from Southeast that the warehouse receipt had been presented to the bank and that the bank had paid out the monies under the letter of credit arrangement. National adhered to these instructions and refused to release the shrimp to Penguin, despite offers by Penguin to pay any and all storage charges due and perform any other conditions precedent to obtaining release of the shrimp.
"(o) On or about September 1964, Southeast and National entered into an agreement whereby National would release the shrimp to Southeast and, in turn, Southeast would agree to indemnify National from any and all liability National might incur as a result of releasing said shrimp to Southeast rather than to Penguin; that pursuant to said agreement, during the fall of 1964, said shrimp was, in fact, released by National to Southeast or its designees and, in fact, sold by Southeast to third persons and the proceeds therefor retained by Southeast.
"(p) Penguin performed all acts required to mitigate its damages and fulfull its duties in this regard."
The law is well settled in Florida that upon appellate review these findings are entitled to the same weight given a jury verdict. Such findings are not to be disturbed unless the record is devoid of competent supporting evidence. Chakford v. Strum, Fla. 1956, 87 So.2d 419; Ainsley Realty Co. v. Kramer, Fla.App. 1967, 198 So.2d 640. On a thorough examination of the record here before is, we find substantial competent evidence to sustain each and every of the findings set out above.
According to the trial court's findings, the warehouse receipt covering the shrimp which were the subject of the sale was transferred to Penguin, such transfer necessarily being accomplished by assignment, since the receipt was nonnegotiable. However, on July 1, Creasman, as agent for Southeast advised National by letter that the transfer order, pursuant to which the receipt had been issued, was cancelled. National was never advised prior to the receipt of Creasman's letter that the warehouse receipt had been transferred to Penguin. Section 678.44 Fla. Stat., F.S.A., then in effect, controlled the rights of persons to whom warehouse receipts were transferred. *43 The pertinent parts of that statute provided:
"If the receipt is nonnegotiable, such person also acquires the right to notify the warehouseman of the transfer to him of such receipt, and thereby to acquire the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt.
"Prior to the notification of the warehouseman by the transferer or transferee of a nonnegotiable receipt, * * * the right to acquire the obligation of the warehouseman may be defeated * * * by a notification to the warehouseman by the transferer * * * of a subsequent sale of the goods by the transferer."
Applying § 678.44, above quoted, to the facts of this case, we conclude that the right of Penguin to acquire the obligation of National was defeated by the cancellation of the transfer order by Southeast. Therefore, that portion of the trial court's final order granting judgment in favor of National Freezers, Inc., must be affirmed.
We now consider the arguments propounded by appellant, Southeast Foods, Inc. In this regard, the trial court's "Finding of Fact, (i)" is particularly relevant. In essence, it recites that Southeast knew of the poor reputation of Nevarez, and that Nevarez was mistrusted for this very reason. Nevertheless, Bailey and Creasman, agents of Southeast, entrusted Nevarez with the documents of title, and even when they learned that these documents had been presented to the local bank for payment, they made no attempt to protect Southeast. To these facts, the trial judge applied the salutary principle of law that, "Where one of two innocent parties must suffer through the act or negligence of a third person, the loss should fall upon the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss." American Process Co. v. Florida White Pressed Brick Co., 56 Fla. 116, 47 So. 942 (1908). See also, Commercial Credit Co. v. Parker, 101 Fla. 928, 132 So. 640 (1931); Glass v. Continental Guaranty Corp., 81 Fla. 687, 88 So. 876, 25 A.L.R. 312 (1921); Joel Strickland Enterprises, Inc. v. Atlantic Discount Co., Fla.App. 1962, 137 So.2d 627. Following this line of reasoning, the conclusion that it is Southeast who must bear the loss becomes inevitable.
However, Southeast contends that the above quoted principle of law does not apply to situations wherein the loss is occasioned by the intervention of a criminal act. While we do not doubt the validity of this proposition, we question its relevance to the case here before us. In this regard, we adopt the reasoning of the Missouri Court of Appeals in Goddard Grocer Co. v. Freedman, Mo. App. 1939, 127 S.W.2d 759. The Goddard opinion states at page 763:
"There is a well recognized rule that a bona fide purchaser of a chattel taken tortiously or wrongfully as where it has been taken by trespass, does not by his purchase acquire a title good against the true owner. The rule applies where possession of a chattel has been obtained by theft or other criminal act such as involves a taking of possession without the owner's consent. The rule has no application in a case such as this, where the owner has voluntarily parted with the possession of the chattel, though induced to do so by means of a criminal act. The distinguishing underlying principle is that in the one case possession has been obtained without the owner's consent, whereas in the other possession has been obtained by the owner's own voluntary act."
See also, Schrader v. Westport Ave. Bank, 1941, 236 Mo. App. 362, 156 S.W.2d 753, 757. To this we would add only the observation that Southeast had the opportunity to avoid the loss, but failed to do so. See, Parsley Brothers Construction Co. v. Humphrey, Fla.App. 1962, 136 So.2d 257.
*44 One additional issue merits discussion. Southeast contends that Penguin has made an election of remedies by maintaining a separate suit against Nevarez, which action precludes recovery herein. But, it appears that the remedies pursued by Penguin are not inconsistent, and hence, may be prosecuted concurrently until such time as the entire claim is satisfied. See Board of Public Instruction for Bay County v. Mathis, 132 Fla. 289, 181 So. 147 (1938).
We have considered all the other contentions raised by appellants in each of these appeals, none of which demonstrate any reversible error; therefore, on the basis of the foregoing, we affirm the judgment appealed.
Affirmed.