427 F.2d 859
 Henry APPELBAUM et al., Plaintiffs-Appellees,
v.
The AMERICAN INSURANCE COMPANY OF NEWARK, NEW JERSEY and
Clarence Roy Hill, individually and on behalf of
certain Underwriters at Lloyd's
signatory to Policy No.
M15456, Defendants-Appellants.
 No. 17891.
 United States Court of Appeals, Seventh Circuit.
 June 2, 1970, Rehearing Denied July 9, 1970.
 
 Richard E. Mueller, Chicago, Ill., for defendants-appellants; Hugh L. Moore, Lord, Bissell & Brook, Chicago, Ill., of counsel.
 Charles J. O'Laughlin, Arthur M. Martin, Chicago, Ill., for plaintiffs-appellees; Jenner & Block, Chicago, Ill., of counsel.
 Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and CUMMINGS, Circuit Judge.
 SWYGERT, Chief Judge.
 
 
 1
 Plaintiffs, doing business as Penguin Frozen Foods, brought this diversity action in the district court against American Insurance Company of Newark, New Jersey, seeking recovery under an All-Risk Transportation policy issued by American. Penguin's claim consists of attorneys' fees and other expenses incurred by Penquin in recovering $49,973.07 from Richardo Nevarez, Jr. and Southeast Foods. After a bench trial, the district court entered judgment in favor of Penguin and against American in the amount of $21,570.08. We reverse.
 
 
 2
 The facts are not in dispute. Penguin Frozen Foods is an Illinois firm engaged in the purchase and resale of frozen seafood. Penguin purchased an All-Risk Transportation policy from American covering seafood owned by Penguin against 'all risks of physical loss or damage from any external cause' while the seafood was in transit. By endorsement Penguin's policy was extended to cover seafood detained in warehouses or other premises for up to ninety days.
 
 
 3
 Penguin's business requires that seafood which it purchases be delivered to restaurants, retailers, and wholesalers as rapidly as possible. Since 1954 Penguin has employed letters of credit in order to insure that seafood purchases and deliveries are handled expeditiously. In the spring of 1964 Penguin commenced transacting business with Ricardo Nevarez, Jr. Through a letter-of-credit arrangement Nevarez, doing business as Marine Garden, successfully completed two or three purchases of shrimp for Penguin prior to the transportation involved in the case at bar.
 
 
 4
 On June 29, 1964 Nevarez contacted Penguin concerning the purchase of additional shrimp. Penguin tentatively agreed, and Nevarez entered into an arrangement with Southeast Foods, a Florida firm, whereby Marine Garden would purchase a quantity of shrimp for $54,717.25. Southeast thereafter instructed National Freezers, Inc. to issue a nonnegotiable warehouse receipt in the name of Penguin. Penguin directed its bank, First National Bank of Chicago, to extend a letter of credit up to $47,973.07 to Nevarez through his bank, First National Bank of Miami. At all times Penguin dealt only with Nevarez and was unaware of the identity of Southeast as the actual vendor of the shrimp.
 
 
 5
 On June 30 Byron Bailey and Joseph Creasman, Jr. officers of Southeast, delivered the nonnegotiable warehouse receipt to Nevarez. They did so despite their knowledge that Nevarez could use the receipt to obtain payment from Penguin on the letter of credit. Around 11:30 a.m. on July 1, 1964, the First National Bank of Miami, in return for the nonnegotiable warehouse receipt, paid Nevarez $47,973.07. Shortly thereafter Nevarez deposited the money in another bank, paid several bills, and then left town not to be discovered until several months later.
 
 
 6
 Bailey and Creasman, who had returned to Nevarez' office on July 1, soon discovered that Nevarez had disappeared and that payment from Penguin would not be forthcoming. During the afternoon of July 1, 1964 Southeast canceled the transfer order of June 29, 1964 under which National had previously issued the nonnegotiable warehouse receipt in Penguin's name. National, who had not been advised by either Penguin or Southeast that the warehouse receipt had been presented and that the bank had paid out monies under the letter-of-credit arrangement, adhered to Southeast's cancellation of the transfer order and refused to deliver the shrimp to Penguin. In September 1964, in return for a promise of indemnification, National released the shrimp to Southeast who subsequently sold them to third parties for $51,424.48.
 
 
 7
 Following these events Penguin moved diligently to recoup its losses. Penguin recovered $19,031.16 from Nevarez, including $11,000 in cash and $8,031.16 received in a foreclosure sale on a mortgage and promissory note obtained from Nevarez. Subsequently, Penguin recovered the balance of its loss, $28,941.91, from Southeast Foods in an action brought in the Circuit Court of Dade County, Florida. The judgment in the action, which was affirmed on appeal, denied recovery against National on a conversion theory, but granted judgment against Southeast on the theory that Bailey and Creasman were negligent in allowing Nevarez to obtain possession of the nonnegotiable warehouse receipt. In obtaining full recovery for its losses, Penguin incurred expenses in excess of $21,000.
 
 
 8
 American argues that the district court erred in numerous respects in granting judgment in favor of Penguin for its attorneys' fees and litigation expenses. American's arguments include: (1) that the All-Risk Transportation policy does not cover conversion of money and instead only takes effect when seafood becomes the property of the insured; (2) that the policy covers only physical loss or damage from an external cause and does not cover fidelity losses of any kind; and (3) that attorneys' fees and expenses are not covered under the policy. Since we reverse on the basis of the first of these arguments, we need not consider the remaining grounds for reversal raised by American.
 
 
 9
 As endorsed by American the All-Risk Transportation policy was extended to:
 
 
 10
 1. Cover seafoods, the property of the assured while temporarily detained at premises listed below, but in no event shall coverage continue for a period exceeding 90 days after arrival of the property at such premises.
 
 
 11
 This extension insures against all risks of physical loss or damage from any external cause except as hereinafter excluded.
 
 
 12
 American maintains that the District Court of Appeals of Florida in Southeast Foods, Inc. v. Penguin Frozen Foods, Fla.App., 203 So.2d 39 (1967), conclusively determined that the shrimp contained in National's warehouse were not the property of Penguin within the meaning of the policy. We agree.
 
 
 13
 Both parties agree that Penguin is bound by the resolution of issues previously litigated in the Florida suit. In that action Penguin sought recovery against National on the theory that National failed to deliver the shrimp to Penguin upon presentation of the nonnegotiable warehouse receipt. A necessary premise upon which this theory is based is that National, by virtue of the issuance of the receipt in Penguin's name and the payment of money to Nevarez on the letter of credit, became bailee for property owned by Penguin. Both the trial court and the appellate court, relying upon Fla.Stat. 678.44, F.S.A.,[1] expressly rejected this theory. Thus the appellate court noted that National had not been previously informed by either Penguin or Southeast that the warehouse receipt had been presented and that funds under the letter of credit had been paid to Nevarez. On the basis of these facts the court held 'that the right of Penguin to acquire the obligation of National was defeated by the cancellation of the transfer order by Southeast.' Southeast Foods, Inc. v. Penguin Frozen Foods, Fla.App., 203 So.2d 39, 43 (1967). A necessary corollary of this holding is that the shrimp never became the property of Penguin, thus precluding coverage under the policy issued by American. Therefore, we hold that the district court erred in allowing Penguin to recover attorneys' fees and expenses.
 
 
 14
 The judgment is reversed.
 
 
 
 [1]
 Fla.Stat. 678.44 reads in pertinent part:
 If the receipt is nonnegotiable, such person also acquires the right to notify the warehouseman of the transfer to him of such receipt, and thereby to acquire the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt.
 Prior to the notification of the warehouseman by the transferer or transferee of a nonnegotiable receipt, * * * the right to acquire the obligation of the warehouseman may be defeated * * * by a notification to the warehouseman by the transferer * * * of a subsequent sale of the goods by the transferer.