UNITED STATES of America

v.

**Hancho C. KIM, Appellant.**

No. 78–1627.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 16, 1979.

Decided March 12, 1979.

---

N. David Povich, Washington, D. C., with whom Kendra E. Heymann, Washington, D. C., was on the brief, for appellant.

Kathleen E. Voelker, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Asst. U. S. Atty. and John T. Kotelly, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before McGOWAN, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

Defendant Hancho C. Kim was convicted of conspiracy to defraud the United States[1] and of making false declarations before a grand jury.[2] Allegedly, Kim received money from the Korean Central Intelligence Agency (hereinafter KCIA) for the purpose of bribing United States Congressmen (conspiracy) and lied to the grand jury when he denied receiving the money (false declaration). Kim was sentenced to three years imprisonment on each count, to be served concurrently. All but six months of his sentence was suspended and supplanted by a period of probation.

Kim appeals asserting that: (1) the trial court erroneously excluded as inadmissible hearsay an exculpatory telex despite its admissibility under both the business records exception[3] and the residual exception for trustworthy hearsay statements[4]; (2) the prosecutor made improper prejudicial comments in his closing argument; (3) irrelevant and prejudicial evidence of defendant's tax returns was admitted into evidence; and (4) the trial court wrongly failed to sever the conspiracy and false declaration counts into two trials. We find none of these arguments persuasive, and affirm.

I

The government's evidence indicated that money was delivered to Kim by Sang Keun Kim (hereinafter S. K. Kim) for the purpose of bribing Congressmen. The government acknowledges that defendant Kim never bribed or approached any Congressmen.[5] It contends that after taking the money, the defendant converted it to his own use.

S. K. Kim, who was a KCIA agent stationed at the Korean Embassy in Washington, was the government's principal witness.[6] He testified that on the orders of General Yang Doo Wan, his superior at the KCIA, he delivered a total of $600,000 to defendant Kim. The money was delivered in two installments: $300,000 on September 12, 1974, and $300,000 on June 6, 1975.[7]

S. K. Kim was not a completely credible witness. He admitted that he had been a KCIA spy, and that when he first learned of the Justice Department's investigation he forged documents and fabricated a cover story in order to impede the investigation.[8] Some of his trial testimony was inconsistent with statements he made to the Federal Bureau of Investigation immediately after he defected.[9] He admitted that he stood to gain from his cooperation with the Government.[10]

---

1. 18 U.S.C. § 371 (1977).

2. 18 U.S.C. § 1623 (1977).

3. Fed.R.Evid. 803(6).

4. Fed.R.Evid. 803(24) and 804(b)(5).

5. In closing argument, the prosecutor said: "[the] Government does not intend nor do we allege in any way that any congressmen[ ] were in fact bought or even approached. . . . [I]t is the conspiracy that is being charged here, not bribery or attempted bribery of any congressman." App. 312a.

6. S. K. Kim defected to the United States.

7. App. 11a and App. 137a–38a, respectively.

8. App. 197a–99a, 204a–06a, 207a–10a.

9. Appellant's Br. 13; Appellee's Br. 11.

10. S. K. Kim defected after learning that the Korean government was planning to punish

The Government buttressed S. K. Kim's testimony with certain corroborating evidence. First, it presented evidence of clandestine meetings between S. K. Kim and the defendant.[11] Second, a government handwriting expert testified that a receipt for the 1974 installment of $300,000, which was in S. K. Kim's possession, was written by the defendant.[12] Third, the government introduced evidence that over one-hundred telex messages were sent from a telex machine in the defendant's house to General Yang's telex number in Seoul.[13] This corroborated S. K. Kim's claim that he sent reports about the defendant's activities to General Yang at KCIA headquarters in Seoul from the defendant's telex machine.[14]

Finally, the government introduced evidence that beginning in 1972 the defendant had serious financial problems. He began to borrow heavily—on his life insurance, on his property, and from finance companies. He was tardy in paying his bills, building up large balances with a number of retail stores. The checks drawn to pay for his children's private school tuition bounced. In July of 1974 he tried to borrow from a finance company that had earlier extended him a loan, but he was turned down because of his slow payment on his previous loan and because he had no sources of income in the United States.

The defendant's financial troubles apparently ended abruptly, on September 13, 1974, the day after S. K. Kim allegedly delivered the first installment of $300,000 in $100 bills. Within weeks, defendant Kim paid all of his bills, many of them with $100 bills, and in the next fifteen months spent close to $200,000 on personal expenditures.[15] The defendant's sudden access to large amounts of money, after a prolonged period of financial difficulty, strongly corroborates S. K. Kim's testimony that he delivered $300,000 to the defendant.

The defendant did not testify at trial. His counsel argued that "Hancho Kim was the innocent scapegoat of a private scheme of S. K. Kim and co-conspirator Yang Doo Wan to enrich themselves by siphoning KCIA funds. The defense also sought to show that Hancho Kim had abundant

him in order to mollify the U. S. Government. He stated that he was not concerned about being punished in the United States (in fact, he is receiving $978 per month as support), but was very worried about possible deportation to Korea. Obviously, cooperating in this prosecution reduced S. K. Kim's chances of being expelled. App. 211a–20a. The Government has made no attempt to expel S. K. Kim.

11. The Government described the relevant testimony as follows:

John M. Fyfe, a Lieutenant with the Prince Georges County Police Department, testified that he lived on Martins Terrace in Lanham, Maryland, which is a dead end street off Martins Lane. Fyfe's house is approximately 240 feet from appellant's, which is around the corner on Martins Lane (Tr. 104–105).

Fyfe testified that from late January or early February 1975 until July 1975, he frequently saw what he believed to be a 1974 Chevrolet station wagon parked across the street from his house facing in the wrong direction. The car was there "many times during the week" (Tr. 106). The driver of the station wagon, an oriental man, would alight and walk down the street to appellant's house. Fyfe took two photographs of the car (Government Exhibits 1 and 2)[10] and reported his observations to the FBI. Fyfe was suspicious because there were sufficient parking places in front of appellant's house, and he thought it unusual for the driver to park on a dead end street and walk some distance to his destination (Tr. 107).

Footnote 10 reads: An enlargement of one of the photographs was shown to S. K. Kim, and he identified the automobile shown in the photograph as his station wagon (Tr. 355–356).

12. Tr. 1034, 1078. The defense handwriting expert testified that "it is not possible to identify the writer of the exemplars [the defendant] as the writer of the receipt.

"I cannot, say that he did write it. I cannot say the he did not write it, . . . ." App. 347a.

13. Appellee's Br. 14–16 (citing transcript pages).

14. Tr. 315–16.

15. In the two weeks after S. K. Kim allegedly gave the defendant $300,000, the defendant spent $20,000. In addition to paying his long overdue bills, he made $11,000 worth of charitable contributions and purchased a Cadillac. Bills totaling about $4,000 were paid with $100 bills. See Appellee's Br. 16–21, and transcript pages cited.

sources of money in Korea to account for his expenditures."[16] The jury was not persuaded by this defense. Hancho Kim was convicted.

## II

To bolster its assertion that Hancho Kim had "abundant sources of money," the defense sought to introduce a telex from the Korean Exchange Bank in Seoul, Korea. The telex was sent instead of the defendant's bank records which were sought by a government subpoena. It stated that on January 13, 1977 the defendant personally withdrew $400,000 which had been deposited in U.S. dollars to his account on three separate days in 1975.[17] Defense counsel contends that the telex proves "that Hancho Kim must have had other substantial sources of funds. Those funds were as likely a source for his expenditures in the United States as for the deposits in Korea."[18] But counsel's argument is flawed by its complete failure to explain the source of his funds in 1974 or the $200,000 of expenditures beginning at that time, and by the incompetence of the evidence upon which it relies.[19] The trial court refused to admit

the telex into evidence, holding it to be inadmissible hearsay.

The defendant maintains that the court erred when it excluded the telex because it falls within two exceptions to the hearsay rule: (1) the business records exception, and (2) the residual exception for trustworthy hearsay. We disagree.

## A

The telex was offered to prove that during 1975 Hancho Kim deposited $400,000 in the Korean Exchange bank in three installments. It contains two hearsay links.[20] The bank's record of deposits made by the defendant is the first hearsay link.[21] The second hearsay link is the telex itself, which contains another bank employee's statement as to what the bank's records show. In each case, the out-of-court statement of the declarant was offered to prove the "truth of the matter asserted"—that the defendant deposited the money (link 1) and that those deposits are reflected in bank records (link 2).

Since the telex contains hearsay, it was properly excluded unless it falls within one of the exceptions to the hearsay rule. Fed.

---

**16.** Appellant's Br. 8.

**17.** According to the telex, Kim deposited $200,000 on January 28, 1975, $100,000 on May 20, 1975, and $100,000 on August 7, 1975. The telex further stated that this money had been withdrawn on January 13, 1977. App. 51a. The telex did not address itself to money on deposit in September, 1974, nor to the actual source of any moneys deposited thereafter.

**18.** Appellant's Br. 32.

**19.** Though the telex has some relevance, it is far from being exculpatory. First, the $400,000 was allegedly deposited in 1975. It is not direct evidence that Kim had funds available in September of 1974, when he began spending lavishly. Second, the money in the Korean Exchange Bank was left in the bank until 1977, and therefore could not have been the source of funds spent by Kim in the United States in 1975. Third, since Kim's source for the $400,000 was not shown, the telex in no way proves that Kim had sources of income available other than the KCIA. Whatever money Kim had in the bank, the source of that money could have been the KCIA, since no evidence was proffered as to Kim's source for any actual money he deposited. If Kim had alternate sources of

funds available before 1975, how can he explain his extensive borrowing and mortgaging up to the very day that he allegedly received money from the KCIA, at which point he began to pay his bills? Finally even if the jury believed that Kim had other sources of income, it would still have been reasonable to conclude that he did not use that income, but rather used KCIA money in the United States. Despite the flawed nature of the telex, however, we acknowledge that it could have served as the basis for some inconclusive arguments that fall short of being full answers or defenses, and do not dispose of the case or this issue on harmless error grounds.

**20.** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

**21.** *See United States v. Watkins,* 171 U.S.App. D.C. 158, 160, 519 F.2d 294, 296 (1975) ("it is a matter of hornbook law that receipts are hearsay as independent evidence of the making of payment . . . .").

R.Evid. 802. We turn, therefore, to the defendant's argument that the telex should ·have been admitted under the exceptions to the hearsay rule.

### B

The defendant maintains that the telex is admissible under the business records exception to the hearsay rule. Essentially, that exception provides that records made and kept in the ordinary course of business may be introduced into evidence despite their hearsay nature. The business records exception is codified in Federal Rule of Evidence 803(6).[22]

Defendant's business records argument is rather complex. It is easiest to analyze when it is divided into two sub-arguments. The first sub-argument is straight-forward: the telex is a business record admissible under Rule 803(6). The second sub-argument is somewhat of a fall-back position, though defendant does not label it as such. It is that the telex is a summary of bank records, and since the bank records fall within the exception, the summary should be admitted as well.[23]

■ 1. *Business records.* The telex fails to meet the business records exception for three reasons. First, Rule 803(6) states that a business record will only be admissible if it is made "at or near the time" of the events that it reports.[24] The telex does not meet this requirement. It reports deposits that took place in 1975. Yet it was not prepared until April of 1977, over two years after the first deposit was allegedly made.[25]

The defendant acknowledges this shortcoming. He argues, however, that the timeliness requirement should be waived in this case. The gist of his argument is that the timeliness requirement is designed to ensure that the declarant's memory is accurate. Here, the argument goes, there is no doubt about memory because the telex merely summarizes bank records that were made contemporaneously with the deposits.[26]

Assuming, *arguendo,* that there is no question about the accuracy of the declarant's memory in this case, we still reject defendant's argument. He cites no authority for waiving the timeliness requirement. And we believe that such a waiver would be inconsistent with the framework of the Federal Rules of Evidence. Rule 803 delineates twenty-three specific exceptions to the hearsay rule. Rule 803(24), the residual clause provides for admission of trustworthy hearsay "not specifically covered by any of the foregoing exceptions . . . ." Under the rules, therefore, evidence that is

22. The rule states:
   The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
   (6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, *if kept in the course of a regularly conducted business activity,* and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
   (Emphasis added).

23. Appellant's Br. 17; Reply Br. 4.

24. *E. g. Seattle-First Nat'l Bank v. Randall,* 532 F.2d 1291, 1296 (9th Cir. 1976) (bank's loan procedural manual not admissible under the business records exception in part because it "was not made contemporaneously with the transaction or a reasonable time thereafter."); *Hiram Ricker & Sons v. Students Int'l Meditation Soc'y,* 501 F.2d 550, 554 (1st Cir. 1974); *Kincaid & King Construction Co. v. United States,* 333 F.2d 561, 564 (9th Cir. 1964); *Melinder v. United States,* 281 F.Supp. 451, 454–55 (W.D.Okl.1968).

25. We recognize, of course, that notations need not have been made contemporaneously. The timeliness requirement is met if the record is made within "a reasonable time thereafter." *Seattle-First Nat'l Bank, supra,* 532 F.2d at 1296. But two years is more than a "reasonable time thereafter."

26. Appellant's Br. 16–18.

not covered by one of the specific exceptions can only be admitted under the residual clause. There is no place in the scheme of the Rules of Evidence for selective waiver of the requirements of particular exceptions. If the requirements of an exception are not met, then the evidence must be excluded unless it falls within the residual exception.

In sum, the telex is not admissible under the business records exception because it does not meet the timeliness requirement.[27] Even assuming that this shortcoming had no impact on the trustworthiness of the hearsay, the telex would not be admissible under Rule 803(6). The argument that the hearsay is trustworthy despite its failure to fall within the specific exceptions is only relevant to admissibility under Rule 803(24), the residual exception.

The second reason that the telex does not fall within the business records exception is that it was not made for a regular business purpose. In order for a document to qualify as a business record, it must have been the "regular practice of that business activity to make the memorandum . . . ." Fed.R.Evid. 803(6). The Advisory Committee on Proposed Rules explained the reason for this requirement:

> The element of unusual reliability of business records is said variously to be supplied . . . by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.[28]

Similarly, the First Circuit explained in *Hiram Ricker & Sons v. Students International Meditation Society*, 501 F.2d 550, 554 (1st Cir. 1974): "A crucial aspect of the business-records exception is that entries be prepared as a *regular* part of the business. . . . Otherwise, there is no basis for the presumption of reliability which is at the heart of the exception." Thus, when a document is made for something other than a regular business purpose, it does not fall within the business records exception.[29]

The telex was sent in response to a government subpoena for the defendant's bank records.[30] The defendant's account at the bank was closed. The telex was not

27. *Melinder v. United States*, 281 F.Supp. 451, 454–55 (W.D.Okl.1968) is practically "on all fours." In *Melinder*, an executrix sued for a refund of fraud penalties paid in reference to her deceased husband's estate. The government sought to introduce a summary of certain expenditures of the deceased. According to the court:

> The summary shows amounts paid to various businesses, banks, insurance companies, etc., and if admitted would tend to show expenditures greatly in excess of reported gross income. The information was obtained by the Government from the records of the payees. It was obtained in the course of its investigation of Dr. Melinder's tax returns. None of the records from which the summary was prepared were offered in evidence and the Government has made no indication of their availability.

281 F.Supp. at 454. The executrix argued that the summary was inadmissible hearsay, and the court agreed. It specifically rejected the argument that the summary was admissible under the business records exception.

> It is clear that the summary cannot be admitted on the authority of the business records statute cited because the *summary was not made within a reasonable time after the date of the transaction it includes, there being lapses of two to five years.*

281 F.Supp. at 455 (emphasis added.)

28. 28 U.S.C.A.Fed.R.Evid.P. 587 (1975).

29. *Gass v. United States*, 135 U.S.App.D.C. 11, 16, 416 F.2d 767, 772 (1969); *United States v. Plisco*, 192 F.Supp. 337, 338 (D.D.C.1961), aff'd 113 U.S.App.D.C. 177, 306 F.2d 784 (1962), cert. denied, 371 U.S. 948, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Standard Oil Co. of Cal. v. Moore*, 251 F.2d 188, 213 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); *United States v. Rappy*, 157 F.2d 964, 966 (2d Cir. 1946); *Seattle First Nat. Bank v. Randall*, 532 F.2d 1291, 1296 (9th Cir. 1976); *Hiram Ricker and Sons v. Student International Meditation Society*, 501 F.2d 550, 554 (1st Cir. 1974); *Colvin v. United States*, 479 F.2d 998, 1003 (10th Cir. 1973); *United States v. Middlebrooks*, 431 F.2d 299, 302 (5th Cir. 1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971); *Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223, 225 (5th Cir. 1969); *Thomas v. Hogan*, 308 F.2d 355, 358 (4th Cir. 1962); *Gilmour v. Strescon Industries, Inc.*, 66 F.R.D. 146, 150 (E.D.Pa.), aff'd 521 F.2d 1398 (3d Cir. 1975).

30. App. 53a. The subpoena was for bank records. It was alleged that Korean secrecy laws prohibit release of such documents. The telex was the bank's only response.

relied on by the bank. And "[a]lthough the method by which the information supplied in [the telex] was retrieved is a method commonly used by the bank, the transaction which gave rise to the Telex message was, according to the manager of the New York branch, the first one of its kind in the bank's history."[31] Thus, the telex was not made for a regular business purpose and it was not "a part of a *series of entries* or *reports. . . .*"[32]

The defendant's attempts to meet this objection are unpersuasive. He argues that the New York branch of the Korean Exchange Bank frequently relies on telex messages from Seoul in making loans and carrying on its business.[33] While that is undoubtedly true, it does not make this telex a business record. The defendant wrongly focuses on the means by which the message was transmitted. The critical factor in determining whether the document satisfied the "business purpose" requirement lies in the reason that the message was prepared and sent, not the means by which it was transmitted. In this case a regular business means of communication was used, but the message did not serve a regular business purpose. Hence, the telex is not a business record.

The defendant also states that the "Federal Rules of Evidence do not *per se* prohibit the admissibility of records prepared in response to judicial process."[34] While this may be true, neither does subpoenaing a record guarantee its admissibility, and the argument does not support defendant's claim that the telex should be admitted as a business record. In fact, the case cited for this proposition involves not the business record exception, but the residual exception.[35] In summary, on the second point, the telex is not admissible under the business records exception because it was not prepared for a regular business purpose.[36]

Finally, it was within the trial court's discretion to refuse to admit the telex under the business records exception because the "circumstances of preparation indicate lack of trustworthiness." Fed.R.Evid. 803(6). In *United States v. Reese*, 183 U.S. App.D.C. 1, 10, 561 F.2d 894, 903 n. 18 (1977) we stated that "the trial court has broad discretion in determining whether documents otherwise admissible as business records are sufficiently trustworthy." Here the trustworthiness of the document was in question because (1) the telex was not entirely consistent with a letter sent by the

**31.** Memorandum Op., April 14, 1978. App. 61a.

**32.** *Hiram Ricker & Sons, supra,* 501 F.2d at 554, *quoting* 5 Wigmore, *Evidence* § 1525 (3d ed. 1940) (emphasis in original).

**33.** Appellant's Br. 19.

**34.** *Id.* 18–19.

**35.** *United States v. American Cyanamid Co.,* 427 F.Supp. 859, 864–66 (S.D.N.Y.1977).

**36.** The defendant tries to side-step this problem by referring to cases involving computer printouts. In such cases courts have held that if information is regularly converted into machine-readable form (*e. g.,* put on tape or cards) in a timely fashion and for a regular business purpose, then retrieval of that information is admissible under the business records exception although the retrieval was specifically for litigation. *E. g., Transport Indemnity Co. v. Seib,* 178 Neb. 253, 260, 132 N.W.2d 871, 875 (1965). Defendant maintains that the situation here is analogous: the bank's records are the "information" and the telex is merely a retrieval of that information.

The analogy is imperfect. The computer print-out cases require the proponent to lay an evidentiary foundation which proves that: (1) the information was converted into machine-readable form in the regular course of business, and (2) the computer automatically retrieved this information unaltered. *United States v. Scholle,* 553 F.2d 1109, 1125 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977); *United States v. Russo,* 480 F.2d 1228, 1241 (6th Cir. 1973); *United States v. De Georgia,* 420 F.2d 889, 893 n.11 (9th Cir. 1969). This foundation is lacking here. The telex is not a part of the regular business records of the bank nor is it a computer print-out from the bank's tapes. And the telex cannot be analogized to a computer print-out from regular business records any more than an affidavit prepared by a bank officer allegedly from bank records would be admissible as a regular business record. Since the defendant did not establish the necessary evidentiary foundation, the telex is not admissible under the rationale of the computer cases.

bank to the appellant,[37] and (2) there was no testimony as to the circumstances surrounding its preparation in Korea. It was not an abuse of discretion for the court to conclude that the telex was not trustworthy in light of these considerations.

In summary, we hold that the telex is not admissible under the business records exception to the hearsay rule for three reasons. First, the telex was not prepared at or near the time of the acts reported. Second, the telex was not sent in the regular course of business. Finally, it was not an abuse of discretion for the trial court to doubt the trustworthiness of the telex.[38]

■ 2. *Summary.* When his business records argument was hard-pressed, the defendant would fall-back to the argument that the telex is an admissible summary of business records. In his reply brief, the defendant responded to the government's argument that the telex was not prepared in a timely fashion by stating:

> The Government's objection to the timing of the telex preparation . . . misses the point. The telex was a summary

transmittal of information timely kept in the regular course of the bank's business. The requirement of contemporaneity applies to the *original* bank documents and has nothing to do with the time that summary was prepared or with the memory of the preparer of the summary.[39]

Similarly, in answer to the government's argument that the telex was not prepared for a business purpose, the defendant conceded the point, stating: "Although the telex was created in response to a subpoena, *the records it summarized were not. . .* Here the underlying bank records of deposits and withdrawals were pre-existing business documents retrieved by means of the telex."[40] Thus, the defendant virtually admits that the telex is not admissible under the business records exception. The underlying bank documents are business records, so their admissibility is covered by Rule 803(6). But the telex transcription is not a business record. Rather, the defendant contends that it is admissible as a summary of business records.[41]

37. The telex indicated the defendant made the deposit in person. The letter did not mention this. This could be viewed as an inconsistency, and it also calls into question the regularity of including in the telex where the deposit was made.

38. Our conclusion that the district court did not err is buttressed by the district court's broad discretion to determine whether a document should be admitted under the business records exception. *E. g. United States v. Evans,* 572 F.2d 455, 490 (5th Cir. 1978) (affirmed admission of business records, stating: "The trial court is vested with a broad discretion to determine the admissibility of the records, and its ruling may not be disturbed in the absence of an abuse of discretion."); *United States v. Wigerman,* 549 F.2d 1192, 1194 (8th Cir. 1977); *Florida Canal Industries, Inc. v. Rambo,* 537 F.2d 200, 202 (5th Cir. 1976) (affirmed exclusion of records, stating: "the trial court has broad discretion in determining the admissibility of documents under the business records exception, and its ruling will only be disturbed on a showing that this discretion has been abused."); *United States v. Page,* 544 F.2d 982, 987 (8th Cir. 1976); *United States v. Fendley,* 522 F.2d 181, 184 (5th Cir. 1975); and *United States v. Middlebrooks,* 431 F.2d 299, 302 (5th Cir. 1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1971) (affirmed exclusion

of records; "The trial court is accorded an area of discretion in determining admissibility of documents as business records and its rulings should not be disturbed unless that discretion has been abused."). Cf. *United States v. Reese,* 183 U.S.App.D.C. 1, 10, 561 F.2d 894, 903 n.18 (1977) (affirmed exclusion of document; "the trial court has broad discretion in determining whether documents otherwise admissible as business records are sufficiently trustworthy.").

39. Appellant's Reply Br. 4.

40. Appellant's Br. 19–20. The quotation misstates the process of retrieval. The telex is *not* a *means* whereby "business documents [are] retrieved." The telex merely referred to data that may or may not have been retrieved from the bank's records.

41. Earlier, we explained that the telex contains two hearsay links. *See* II.A. Defendant's argument is that the first hearsay link (the bank records) is accounted for by the business records exception. The second hearsay link (the telex itself) however, is not a "business record." The defendant argues that this link is admissible as a summary. Thus, by applying first the business records exception and then the rule admitting summaries, defendant main-

We assume, arguendo, that the underlying bank documents are business records and would be admissible under Rule 803(6). Those documents, however, are unavailable. The question, therefore, is whether something that purports to be a partial summary of those unavailable documents is admissible. We hold that it is not.

Summaries are only admissible when a proper foundation has been laid. The party offering the summary must introduce the underlying data into evidence, or at least make that data available for inspection by opposing parties. Fed.R.Evid. 1006;[42] *Trout v. Pennsylvania Railroad Co.*, 300 F.2d 826, 830 (3d Cir. 1962). When the underlying documents are not subject to examination by the opposing parties, the summary should not be admitted into evidence. *Pritchard v. Liggett & Meyers Tobacco Co.*, 295 F.2d 292, 300–01 (3d Cir. 1961); *Melinder v. United States*, 281 F.Supp. 451, 454–55 (W.D.Okl.1968).[43] The underlying data is not available here, and therefore, the telex can not be admitted as a summary of those records.[44]

In short, we hold that the telex is not a business record admissible under Rule 803(6). Nor is it admissible as a summary of business records. Consequently, the trial court did not err when it refused on those grounds to admit the telex.

### C

The defendant also contends that the telex should have been admitted under Rule 803(24), the so-called "residual" or "catch-all" exception, which covers "other

---

tains that the telex is admissible despite its double hearsay nature.

**42.** Fed.R.Evid., Rule 1006 provides:
 The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.
 In addition to not presenting the original or duplicate records, the records are not voluminous.

**43.** Computer print-outs have been admitted despite the unavailability of the underlying documents, but only when the evidentiary foundation proved that the information was put into machine-readable form in the regular course of business. *E. g. United States v. Russo*, 480 F.2d 1228, 1241 (6th Cir. 1973); *United States v. De Georgia*, 420 F.2d 889, 893 n.11 (9th Cir. 1969). In such a case, the Sixth Circuit was careful to explain that the print-out was being admitted as a business record and not as a summary. In fact, the court held that the computer print out was an "original" document, and not a summary. *Russo, supra.*
 Similarly, *Williams v. Humble Oil & Refining Co.*, 53 F.R.D. 694, 698 (E.D.La.1971) held that reports summarizing the history of the defendant's oil wells were admissible despite the unavailability of the underlying documents. The Court stated:
 Nor does it matter that these reports are compilations. Many books of record are books of secondary entry. In order to evidence a sale, a journal may be admitted even though it reflects merely the entry originally made on an invoice. If this is the situation even when the original record is available, it should be so *a fortiori* when the original record appears to be no longer at hand. But like the computer cases, *Williams* is distinguishable. The journals involved there were admitted under the business records exception, not as summaries of business records. They were "prepared within a reasonable time after the occurrence of the events reflected in them." And critically, the journals were prepared as a regular part of the company geologist's duties and were relied on by the company. Here the telex is not admissible as a business record, so the defendant must try to have it admitted as a summary. Under such circumstances, the underlying documents must be available for inspection.

**44.** Defendant states that he believed that the prosecution agreed to stipulate to the information in the telex. His counsel implies that but for the stipulation, they might have tried harder and perhaps would have obtained the underlying documents. There is no support for this assertion. It is inconsistent with the parties' statement that Korean secrecy laws prohibit release of the documents. Moreover, the district court held that "since no written stipulation to finalize the alleged stipulation was ever signed, the court must conclude that this was a misunderstanding which the court is without power to remedy." Memorandum, April 14, 1928. App. 65a n.2. It is also significant that no proffer of the bank records of Kim's account was made by way of motion for a new trial.

exceptions".[45] The purpose of this residual exception rule is to allow trial judges to admit certain hearsay statements that do not fall within any of the specific exceptions, but which have "equivalent circumstantial guarantees of trustworthiness." Fed.R.Evid. 803(24).

The legislative history of this exception makes it very clear that this was intended to be a narrow exception to the hearsay rule, applying only in exceptional cases. The House bill had eliminated a similar provision because it "injected too much uncertainty into the law of evidence . . ." Conference Committee Notes, H.R.Rep.No. 93–1597, Note to Paragraph (24), 28 U.S.C. A.Fed.R.Evid. p. 583 (1975). The Senate bill, which became the Rule after being slightly amended by the Conference Committee, included a residual exception. The Senate Report that accompanied the bill carefully narrowed the exception.

It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. Such major revisions are best accomplished by legislative action. It is intended that in any case in which evidence is sought to be admitted under these subsections, the trial judge will exercise no less care, reflection and caution than the courts did under the common law in establishing the now-recognized exceptions to the hearsay rule.

Committee on the Judiciary, S.Rep.No.93–1277, Note to Paragraph (24), 28 U.S.C.A. Fed.R.Evid. p. 583 (1975).[46]

In light of the narrow construction that the residual exception must be given, we have no difficulty concluding that the trial court did not abuse its discretion when it excluded the telex. Quite simply, the telex does not meet the criteria established in Rule 803(24).

First, the telex does not have circumstantial guarantees of trustworthiness equivalent to the enumerated hearsay exceptions. Business records are presumed to be trustworthy because they are made in the ordinary course of business, and because a business that relies on its records will ensure that those records are accurate.[47] Here the telex was not sent for a business purpose and it was not relied on by the business.[48]

---

**45.** Rule 803(24) provides:

The following are not excluded by the hearsay rule, even though declarant is available as a witness: . . .

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

Rule 804(b)(5) is identical, except that it applies to cases in which the declarant is unavailable. Our discussion applies to both rules.

**46.** *Accord: United States v. Mandel,* 591 F.2d 1347, at 1368 (4th Cir. 1979). *But see United States v. American Cyanamid Co.,* 427 F.Supp. 859, 865–66 (S.D.N.Y.1977) in which the court argued that the residual exception should be applied liberally. The court specifically discounted the expression of legislative intent in the Senate Judiciary Committee's notes. We disagree with the approach taken in *American Cyanamid.*

**47.** *See* text at n.28, *supra.*

**48.** The defendant maintains that the telex is exculpatory because it shows that he deposited $400,000 in the Korean Exchange Bank at a time when he had allegedly been given only $300,000 by the KCIA. The existence of the extra $100,000, Kim says, implies that he had other sources of funds than the KCIA. The dates of deposit stated in the telex, therefore, are critical to Kim's defense.

Moreover, the burden is on the proponent to produce evidence of trustworthiness, and it was not unreasonable for the district court to conclude that the telex was not trustworthy.

Second, the defendant has not demonstrated that the telex is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."[49] The defendant argues that it is the most probative evidence available as to the "dates and amounts of prior bank deposits. . . ."[50] While this may be true, it does not satisfy the requirement of the rule.

The telex was offered to prove that the defendant had "substantial alternative sources to account for [his] expenditures."[51] Records of bank deposits are one way to prove the actual deposit of money but they are not a very persuasive way of proving the actual source of the money so deposited or that it was actually income and not gifts or return of principal.[52] Much stronger evidence of alternative sources of income would be the actual business records reflecting the profitable business activities which produced that income, or testimony from business partners, employees and accountants as to the actual income source in some active business of Hancho Kim.[53] The

defendant has never suggested any reason why such evidence could not be procured through reasonable efforts. Since the defendant has failed to demonstrate that other, more probative evidence of sources of his income could not reasonably be obtained, we cannot hold that the telex "is more probative on the point for which it is offered than any other evidence which proponent can procure through reasonable efforts."

In sum, the residual exception does not support the admissibility of the telex. Congress intended the exception to apply in a very few cases in which the evidence is very important and very reliable. Here it is neither. Moreover, the trial court is vested with considerable discretion and we are not cited to any cases in which the court's refusal to admit evidence under this exception was held to be error.[54] On all the facts, we conclude that the district court was well within his discretion in refusing to admit the telex and thus did not err when it refused to admit the telex under the residual exception.

### III

The defendant also argues for reversal on the basis of certain allegedly improper comments made in argument by the

---

These dates of deposit were not recorded in the telex for a business purpose. And the bank did not rely on the accurate recording of those dates. In fact, even if the bank had given Kim $400,000 on the basis of information contained in the telex (which was not the case here), inclusion of the dates of deposit would still have served no business purpose and would not have been relied on by the bank.

Therefore, the dates of deposit, which are crucial to Kim's defense, do not have circumstantial guarantees of trustworthiness equivalent to the business records exception. And since there is no testimony as to the *sources* of the money deposited the evidence is far short of being exculpatory. *See* n.19, *supra.*

49. *See generally United States v. Mathis*, 559 F.2d 294, 298 (5th Cir. 1977).

50. Appellant's Reply Br. 5.

51. *Id.* at 2, *see also* text at n.18, *supra.*

52. *See* n.19, *supra.*

53. Of course, other obvious sources are the defendant's personal bank records and the defendant himself, but we do not rely on his failure to testify or to produce such records as a basis for excluding the evidence.

54. In *United States v. American Cyanamid Co.*, 427 F.2d 859 (S.D.N.Y.1977) the Court held that certain documents were admissible under the residual exception. The court did not hold, however, that it would have been error for this evidence to have been excluded. Moreover, the court erroneously rejected the Senate Committee's mandate that the residual exception should only apply in exceptional cases. *United States v. Smith*, 172 U.S.App.D.C. 297, 521 F.2d 957 (1957) indicates that courts should be more liberal in admitting evidence in favor of a criminal defendant than against him, but it is distinguishable because it involved the business records exception, not the residual exception. In addition, both *Smith and Cyanamid* involved documents that were trustworthy, which is not the case here.

prosecutor. The defendant introduced evidence that he returned from Korea in 1977 with a check for $400,000. His counsel told the jury in his final argument that the government knew about the check but deliberately failed to offer it as evidence. He implied that the government tried to withhold this evidence from the jury because the 1977 check supported defendant's claim that he was able to get money without the aid of the KCIA.[55] In his final argument the prosecutor responded to the unsupported implications of the argument by defense counsel by suggesting the possibility of another source, i. e., that perhaps the $400,000 was a payment from the KCIA to Kim so that he would "maintain his silence."[56] There was no support in the record for either suggestion.

Without even waiting for an objection, the trial court told the jury that there was no evidence that the $400,000 was hush money. He further stated: "The fact is that the $400,000 check is in evidence and that's it. We can't speculate about it."[57] The prosecutor immediately retreated from his suggestion that the $400,000 was a payment to the defendant to maintain his silence. He stated:

> There is no evidence as to where that $400,000 came from. So what purpose would the government want to toss it

into the hopper if there is no explanation for it?

> I would submit that that hardly is any basis for believing that Hancho Kim had money in Korea back in 1974 and 1975.[58]

The defendant maintains that the prosecutor's suggestion of the possibility that payments might have been made to buy silence is reversible error because (1) it was a highly prejudicial comment based on evidence not in the record and (2) it constituted an impermissible comment on the defendant's failure to testify. We disagree as to the effect of the statement and as to its interpretation.

### A

Involvement in a cover-up implies involvement in the crime being covered-up. Therefore, the defense claims that it was prejudiced by the prosecutor's statement—not supported by the record—that Kim was paid to remain silent. We hold that this comment does not warrant reversal of the conviction for a combination of two reasons.

First, while we recognize that in closing argument counsel must not make "references to matter that was not in evidence,"[59] in this case defense counsel by his prior statement opened the door for such comment. The prosecutor's statement that the $400,000 might possibly be explained as a

---

**55.** Defense counsel stated:

> And, ladies and gentlemen, I said in my opening statement—and fortunately I was able to prove it—that he came back in 1977, February, with $400,000, and the most amazing thing about that, ladies and gentlemen, was that the government knew it all the time. It was sitting on that man's file since June of 1976. Do you think they put it in evidence? Tr. 2309–10. The possession of $400,000 in 1977 (or even in 1975) does not satisfactorily explain Kim's spending spree with $100 bills beginning in September, 1974. Appellant's argument in this respect is a diversionary *non sequitur*, much like the accused bank robber who attempted to defend by asserting that when the bank was robbed he was five miles away riding a white horse and produced a white horse to prove his alibi.

**56.** The prosecutor's statement was: "I am not certain what to make of that $400,000. A person of a naturally suspicious mind might wonder, well is the Korean government paying off

Hancho Kim to maintain his silence? Maybe. That's one alternative." App. 394a.

**57.** *Id.*

**58.** *Id.* This exposed the fallacy in Kim's argument. The fact that he had money in 1977 did not prove that he had money in 1974 when he suddenly appeared to be affluent, i. e., the presence of the white horse now did not prove that he was riding the white horse five miles away when the bank was robbed. *See* n.55, *supra*.

**59.** *United States v. Whitmore,* 156 U.S.App. D.C. 262, 266, 480 F.2d 1154, 1158 (1973). *See also United States v. Hawkins,* 193 U.S.App. D.C. ——, at ——, 595 F.2d 751, at 754 (1978); *United States v. Jones,* 157 U.S.App. D.C. 158, 164, 482 F.2d 747, 753 (1973) ("It is . . . incumbent on counsel to confine his remarks in summation to facts which are in evidence and the reasonable inference therefrom.")

payment for Hancho Kim's silence was in response to defense counsel's suggestion that the government's failure to introduce the check was an indication of a bad faith effort to conceal testimony. Since the defense question referred to improper motivations which had not been the subject of testimony, the government was placed in a position where it was practically forced to reply by a similarly speculative reference to motive. The prosecutor's remark was a rhetorical suggestion presented as pure responsive argument. Neither inference is supported by the record, but once defense counsel directly implied extra-record inferences should be drawn from the evidence we can not hold that the prosecutor's responsive suggestion in kind is reversible error. *United States v. Tortora*, 464 F.2d 1202, 1207 (2d Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972); *United States v. Polizzi*, 500 F.2d 856, 889–90 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).[60]

Second, the trial court immediately instructed the jury that there was no evidence that the $400,000 was a payment for Hancho Kim's silence. Moreover, the prosecutor retracted his suggestion and stated that "[t]here is no evidence as to where that $400,000 came from."[61] Improper argument by the prosecutor is not grounds for reversal unless there is "substantial prejudice as well as error." *Cross v. United States*, 122 U.S.App.D.C. 283, 285, 353 F.2d 454, 456 (1965). Retractions by the prosecutor and cautionary instructions by the court

can ameliorate prejudice. *United States v. Hawkins*, —— U.S.App.D.C. —— at ——, 595 F.2d 751 at 754 (1978); *Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969); *Cross v. United States, supra.*[62] We hold that since defense counsel initially opened the subject by a reference to matters outside the record, the trial court's instruction and the prosecutor's retraction were sufficient to remove any possible prejudice to the defendant from the prosecutor's comment.

In sum, because the defense opened the door, because the prosecution did not claim any factual support for the rhetorical suggestion, because the trial court acted to remove any possible prejudice, and because the case against the defendant was supported by testimony of the principal witness and corroborated by ample circumstantial evidence, we hold that the prosecutor's reference to matter not in evidence was not reversible error. We conclude that the combination of these factors undercuts the defendant's claim that the prosecutor's comments denied him a fair trial.[63]

### B

■ The defense also asserts that the prosecutor's reference to payments to Hancho Kim for his silence was an adverse comment on Kim's exercise of his constitutional right to refrain from testifying at the trial. Of course, a prosecutor may not comment on a criminal defendant's failure to testify. *Griffin v. California*, 380 U.S. 609,

---

**60.** In *Tortora*, the defense argued that the defendant, who was charged with loan sharking, was too small to frighten his victim and extort money from him. In response the prosecutor asked rhetorically, "how much strength does it take to pull a trigger." Though there was no evidence that defendant used a gun, the court held the prosecutor's comment was permissible. Judge Lumbard wrote for the court:

> The rhetorical question was in response to the defense suggestion that Tortora was too small to frighten Formiglia and extort money from him. As a response to prior argument, the statement was within the limits of fair argument.

464 F.2d at 1207.

Similarly, in *Polizzi*, the court held that the prosecutor's reference to the indictment, which

normally would be impermissible, was acceptable as a response to the defense argument that the prosecution was a personal vendetta of the prosecutor.

**61.** *See* text at n.58.

**62.** *See also Simon v. United States*, 137 U.S. App.D.C. 308, 311, 424 F.2d 796, 799 (1970); *United States v. Polizzi, supra*, 500 F.2d at 889–90.

**63.** *United States v. Projansky*, 465 F.2d 123, 138 (2d Cir.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972) ("the test of such errors is whether their commission denied the defendant a fair trial.")

85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). But we do not believe that the prosecutor did so in this case.

According to the Fifth Circuit in *United States v. Warren*, 550 F.2d 219, 227 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978):

> the threshold question to be answered is whether the challenged remark refers to the defendant's failure to testify. The guideline used in answering this inquiry is:
>
> > . . . whether the remark was manifestly intended or was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. White*, 444 F.2d 1274, 1278 (5th Cir. 1971), *cert. denied*, 404 U.S. 949, 92 S.Ct. 300, 30 L.Ed.2d 266 . . . (1971).

The prosecutor's remarks do not meet this test. His comment referred to the payment of hush money. There was no explicit reference to the defendant's failure to testify, and we do not believe that the prosecutor was understood as referring to the defendant's exercise of his constitutional right.[64]

The reference to maintaining silence would more likely have been taken as a reference to his refusal to testify to incriminating facts before the grand jury. Moreover, the trial judge specifically instructed the jury not to draw any inference from the defendant's failure to testify at trial. When the prosecutor's comment is at worst a vague reference to defendant's failure to testify, such an instruction is sufficient to remove any possible prejudice. As the Third Circuit stated in *United States v.* *Adamo*, 534 F.2d 31, 40 (3d Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976), "[w]e believe that the jury in all probability did not understand the Government to be commenting on [the defendant's] failure to testify, but that, if it did, the judge's instructions were sufficient to cure that impression."[65]

We therefore hold that the remark of the prosecutor in his closing argument does not warrant reversal of Hancho Kim's conviction.

## IV

■ Next, the defendant argues that his conviction must be reversed "due to the prejudice from presenting to the jury, in juxtaposition to defendant's other expenditures, the amounts of his federal tax payments."[66] Defendant's tax payments were listed on a chart as part of defendant's total expenditures during the fifteen months following his alleged receipt of $300,000 from S. K. Kim. The total amount of his expenditures was relevant to prove that subsequent to his receipt of money from the KCIA the defendant spent a great deal, whereas before the date of that alleged payment he had spent very little.

Defense counsel acknowledge that the tax payments are relevant, but they contend that they should not have been introduced because "the jury may well have believed him guilty of tax evasion, and punished him for that crime rather than for the offenses for which he was tried."[67] Their argument is based on Rule 403, which permits a trial court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . .." Fed.R.Evid. 403.

**64.** *See United States v. Johnson*, 174 U.S.App. D.C. 72, 75, 527 F.2d 1381, 1384 (1976) ("we need not easily leap to the conclusion that 'a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' ")

**65.** *Accord: United States v. Warren, supra*, 550 F.2d at 228:

> The remark did not specifically point to any or all of the defendants as not having testi-

fied, and in light of the weight of the evidence and the fact that the trial judge gave a positive instruction to the jury that nothing was to be presumed from the failure of the defendants to testify, any impropriety in the remark and the way it was made must be held to be harmless beyond any reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**66.** Appellant's Br. 42.

**67.** *Id.* 43.

As Judge Wright stated in *United States v. Wright*, 160 U.S.App.D.C. 57, 62, 489 F.2d 1181, 1186 (1973), "[i]n ruling on evidentiary matters, the trial judge must balance the probative value of testimony against potential prejudice, and his exercise of discretion will not be disturbed on appeal save for grave abuse." In light of this standard of review, appellant's argument for reversal is hardly colorable.

The defendant's income taxes were never mentioned or commented on during the trial. The only time they were before the jury was as one item on a chart that listed about fifty different expenditures. Under such circumstances, it is highly unlikely that the jury would focus undue attention on this item. Moreover, it is common knowledge that low tax payments do not necessarily indicate tax evasion. Thus defendant's fears of prejudice are almost complete speculation. Under such circumstances, there is no basis for finding that the trial court abused its discretion when it admitted the tax item in a chart along with 49 other items of obviously relevant evidence.[68]

## V

■ Finally, the defendant argues that it was error to join the conspiracy and false declaration counts in a single trial. We find this contention wholly without merit.

Rule 14 of the Federal Rules of Criminal Procedure provides that a court may order separate trials "[i]f it appears that a defendant . . . is prejudiced by a joinder of offenses." "The trial court has a wide range of discretion in matters of severance, and we reverse only upon a finding of clear prejudice and abuse of discretion." *United States v. McClintic*, 570 F.2d 685, 689 (8th Cir. 1978); *United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978); *United States v. Papia*, 560 F.2d 827, 840 (7th Cir. 1977).

Severance is most likely to be appropriate in cases in which evidence relevant to one count would be inadmissible with respect to the other, and would tend to unfairly prejudice the defendant on the other count. *Robinson v. United States*, 148 U.S.App. D.C. 58, 66, 459 F.2d 847, 855 (1972). Conversely, when both counts involve essentially the same evidence, "joinder is ordinarily appropriate." *McClintic, supra.*

Here both counts are based on almost exactly the same evidence. There is practically no danger that evidence admissible on one of the counts would be both inadmissible and prejudicial on the other count. Moreover, if there were separate trials, the result would be a great duplication of effort. When "the proof at separate trials would largely overlap, judicial economy [is] served by a single trial, with no sacrifice of appellant's rights." *McGrath, supra.*

Defendant maintains, however, that the false declaration charge—not the evidence that would be introduced to prove that charge—would prejudice his defense against the conspiracy charge. The gist of his argument is that it is always unfair to join a perjury charge to other substantive counts in a single trial because

the knowledge of the false declaration count has the effect of informing the petit jurors that the defendant's testimony is not to be believed. Accordingly, the defendant is impeached as soon as he reaches the witness stand. On the other hand, in the event that defendant chooses not to take the stand the substantive offense is substantially reinforced by the addition of the false declaration count.

*United States v. Pacente*, 490 F.2d 661, 664 (7th Cir. 1973).

*Pacente* was reversed by the Seventh Circuit *en banc*. 503 F.2d 543, 547–49 (7th Cir.), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). We are persuaded by Judge Fairchild's opinion for the *en banc* majority. He wrote:

---

**68.** The court did act to prevent any prejudice to the defendant by excluding his tax returns and only admitting the tax payment.

Conceivably a trial juror may be influenced in deciding to believe a witness' testimony by the fact that the grand jurors heard the same testimony and did not believe it.

These things are all conceivable, but it is the judgment of a majority of this court that it is an unwarranted over-refinement to speculate that they present a significant danger that the trial jurors, acting together, will give weight to the conclusion reached by the grand jurors and fail to decide the issues of fact according to their own proper evaluation of the evidence.

503 F.2d at 547. In reaching this conclusion, Judge Fairchild stressed that the trial court had instructed the jury that the indictment is not evidence. He held that such an instruction is a "meaningful protection" against the possibility that jurors might consider a perjury indictment as evidence against the accused.

The jury that convicted Hancho Kim was similarly instructed.[69] In light of this instruction, we hold that the trial court did not abuse its discretion when it refused to sever the two counts into separate trials.[70]

### VI

Since we find no reversible error in the trial court's handling of this case, we affirm defendant Hancho Kim's convictions.

*Judgment accordingly.*

---

**69.** Tr. 2339, 2353, 2357; Appellee's Br. 49–50.

**70.** Perjury has often been jointly tried with other charges despite motions for severance. *E. g. United States v. Jamar*, 561 F.2d 1103 (4th Cir. 1977); *United States v. Pacente, supra;* *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Mitchell*, 372 F.Supp. 1239, 1256 (S.D.N.Y.1973).