899 So.2d 281 (2004)
T.C.
v.
CULLMAN COUNTY DEPARTMENT OF HUMAN RESOURCES.
B.P.B.
v.
Cullman County Department of Human Resources.
2030376 and 2030389.
Court of Civil Appeals of Alabama.
August 20, 2004.
Certiorari Denied October 15, 2004.
Certiorari Denied October 22, 2004
*283 G. Edward Coey, Hanceville, for appellant T.C.
Kathryn A. King, Cullman, for appellant B.P.B.
Troy King, atty. gen., and J. Coleman Campbell, deputy atty. gen., and Lynn S. Merrill, asst. atty. gen., Department of Human Resources.
Alabama Supreme Court 1031851.
Certiorari Denied (as to T.C.) October 15, 2004.
Certiorari Denied (as to B.P.B.) October 22, 2004
Alabama Supreme Court 1031857.
CRAWLEY, Judge.
T.C. ("the mother") and B.P.B. ("the father") appeal from judgments of the Cullman Juvenile Court terminating their parental rights to two children, J.T.B., their 12-year-old son ("the son"), and T.N.B., their 14-year-old daughter ("the daughter").
Since November 2001, the son and the daughter have been in the custody of the Department of Human Resources ("DHR") in a therapeutic foster home. In June 2003, DHR filed petitions to terminate the parental rights of the mother and the father. Following consolidated hearings on December 15 and 17, 2003, the juvenile court, on January 8, 2004, entered judgments terminating the parental rights of both parents as to both children.
At the time of trial, the mother was 32 years old and the father was 39 years old. The parents were never married. They lived together for several years, and, after they separated in 1992 or 1993, the mother and the children went to live with the children's maternal grandmother. In 1995, the mother moved to Huntsville and asked the father to take custody of the children. The father agreed; the children resided with him for six years, until the summer of 2001. During the time the children were in the custody of the father, DHR investigated three child-abuse and neglect reports. One report in December 1996 involved an allegation of sexual molestation of the daughter, who was then six years old, by the teenage son of the woman married to the children's maternal uncle. That report was marked "reason to suspect." Another report in June 2000 involved facial cuts and bruises to the daughter. The evidence indicated that the father, who was angry at the daughter for not cleaning her room, threw an object that hit a box; the box then "flew up" and *284 struck the daughter in the face. The daughter told investigators that the father had, on other occasions, slapped her around, knocked her against a wall, and hit her on the head with a belt. The third report indicated that on June 25, 2001, the children had witnessed an altercation between the father and his live-in girlfriend during which the father brandished a gun, threw his girlfriend's car keys in a pasture, and then forced the children to look for the keys.
Shortly after the incident made the basis of the third report, the father broke up with his live-in girlfriend and asked the mother (who had, by that time, moved back to Cullman County) to take custody of the children "until he got [his] mental stability back." The mother agreed. In July 2001, the father, along with L.G., who was to become the father's next live-in girlfriend, and L.G.'s then-husband, was arrested; the father was charged with possession of marijuana and possession of firearms after conviction of a felony.[1]
In September 2001, DHR received a report that the mother was leaving the children for weeks at a time with the children's maternal grandmother, who worked a 3:00 p.m. to 11:00 p.m. shift at a chicken-processing plant. The report indicated that during the maternal grandmother's absence the children were being left with irresponsible caregivers, including an uncle who used drugs and a family whose teenager forced the son, who was then 10 years old, to watch pornographic films. The son and the daughter reported that they had seen the mother and her boyfriend use drugs. At DHR's request, the mother took a drug test and tested positive for methamphetamines.
DHR took the children into custody on November 28, 2001, when social workers confirmed the following reports: that the mother and the children had been "kicked out" of the maternal grandmother's home and were staying with one of the mother's friends; that the mother was unemployed and without transportation; that the mother was taking prescription medication, namely, Xanax and Prozac, that she had obtained from the friend with whom she was staying; and that the children had been truant from school for two weeks. After the children were placed in foster care, DHR developed an Individualized Service Plan ("ISP") for both parents. At trial, DHR witnesses testified that the father was cooperative at ISP meetings but that the mother was uncooperative and hostile; they testified that the mother had stated that she did not need help and did not want DHR involved in her life.
The ISP required the parents to achieve the following goals in order to be reunited with the children: to undergo drug and alcohol assessments; to participate in random, bimonthly color-coded drug screens; to obtain safe and stable housing; to obtain stable employment; to pay child support; to complete parenting classes; and to undergo evaluations by a psychologist and to complete any follow-up recommendations made by the psychologist.
During the 25 months that the children were in foster care, the mother accomplished only one of the goals set out in the ISP  the completion of a parenting class. The evidence indicated that it took the mother one year to finish the 10-week parenting program. The mother testified that she was unable to complete many of the ISP requirements because she had no *285 transportation. DHR witnesses testified, however, that they had assured the mother that, if she would give them 24 hours' notice, they would provide her with transportation to any venue designated in her service plan. According to those witnesses, the mother simply did not request assistance with transportation.
The mother failed to submit herself for a drug and alcohol assessment. She appeared for one drug screen, which was negative, but she failed to appear for any other scheduled screens, despite being informed that a "no show" would be considered a positive result. When DHR asked the mother to submit to a drug screen on October 2, 2003, two months before the trial of this case, she refused, acknowledging that, if she submitted, she would fail the drug test. At trial, the mother admitted that she had used cocaine, methamphetamines, "acid," marijuana, and alcohol, but she insisted that her drug use was "not a problem." She stated that she had last used drugs four months before trial.
The mother arrived late for her psychological evaluation and had only one hour to spend with Dr. Barry Wood, a licensed clinical psychologist, despite having been informed that the evaluation would take two hours. Dr. Wood testified that, although he could not complete the mother's psychological evaluation, his preliminary diagnosis was that the mother suffered from polysubstance dependence and a personality disorder with borderline histrionic features. Dr. Wood stated that the mother had reported sexual abuse as a child, a chronic problem with her relationships with men, mood swings, and suicidal ideation.
The mother never obtained stable housing or employment. During the 25-month period that the children were in foster care, the mother's living arrangements followed a pattern of living with the maternal grandmother for short periods until the two women had a falling out, then moving in with various male and female friends, and eventually returning to the maternal grandmother's home to begin the cycle again. At the time of trial, the mother was living with the maternal grandmother. The mother's longest sustained time of employment was the eight and one-half year period, ending immediately before DHR removed the children, when she worked as an exotic dancer in Huntsville. After that, the mother worked at a golf club restaurant for two months. At the time of trial, she was unemployed. Beginning in December 2002, she was ordered to pay $203.32 per month in child support. Except for one child-support payment that was deducted from her paycheck while she worked at the restaurant, the mother paid no child support.
The father accomplished a number of the goals set for him in the ISP. He had a drug and alcohol assessment, and in January 2003 he was scheduled to have bimonthly drug screens through the Cullman Court Referral Office. He had four "no shows," two negative screens, and 3 screens that were positive for methamphetamines or methamphetamines and marijuana. His last positive drug screen was in August 2003, four months before trial. The father claimed that he had 12 additional negative drug screens that were performed at a local hospital, but he failed to present documentary evidence of the results of those screens at trial. He acknowledged that he had used drugs as recently as late September or early October 2003. The father testified that when he went to the Northwest Alabama Mental Health Center the staff recommended that he receive outpatient treatment for drug abuse but that he declined to participate in outpatient treatment, concluding instead that he needed inpatient treatment. At *286 trial on December 17, he testified that he was scheduled to check into Sunrise, a drug-rehabilitation facility in Russellville, on December 24.
The father maintained a stable home with L.G. and her three children (two teenage sons and a nine-year-old daughter). The five of them reside in a three-bedroom mobile home that the father owns. After the father and L.G. were arrested on drug charges in July 2001, DHR removed L.G.'s children and placed them with relatives. Six months before the trial of this case, DHR conducted a favorable home study on the father's home and returned L.G.'s children to her.
The father maintained continuous employment as a construction worker, earning about $500 per week. Beginning in December 2002, he had been ordered to pay $394.68 per month in child support for the son and the daughter. He made only two child-support payments during the one-year period before trial. When questioned about why he had not paid his child support, he answered that he would be glad to support his children if they were returned to his care. He also explained that he had been paying attorneys to represent him and L.G. in an attempt to have L.G.'s children returned to her, supporting L.G. (who was not employed), and then supporting her children once they were returned, and that he did not have any money left to pay child support for his own children. The father testified that he had even made provision for the support of L.G. and her children during the time he would be away at the inpatient drug-rehabilitation center.
The father completed parenting classes with L.G., for whom parenting classes were also an ISP goal. The father had a psychological evaluation by Dr. Barry Wood. Dr. Wood's diagnosis of the father included a history of alcohol dependence with reported sustained full remission and generalized anxiety disorder, as well as narcissistic personality disorder with antisocial and schizotypal features. Dr. Wood explained that narcissistic personality disorder involved a sense of grandiosity, self-importance, and lack of empathy for others. He said that antisocial personality disorder suggested an ill-defined conscience, poor impulse control, and thrill-seeking behavior. The father attended biweekly counseling sessions with L.G. and her children, a requirement that DHR had imposed upon L.G. as a condition of reunification with her children.
While the son and the daughter were in foster care, both parents had bimonthly visitation with the children; initially, the visitation was unsupervised, but later it was changed to supervised. During a 10-month period in 2002, the mother missed 6 visits; after that she consistently visited the children. The father never missed a visit. The father's telephone visitation with the children was monitored, however, after the children reported that he had intimidated and cursed them. According to the daughter, the father had told her that it was her fault that he had failed a drug screen because he was so upset with her that he was driven to use drugs. The son reported that the father had called him "a sorry s.o.b."
Betty Perry, an employee of the Northwest Alabama Mental Health Center who has a master's degree in clinical therapy, counseled the children for two years. She testified that initially both children had sexual "acting-out" problems. In addition, she stated that the son had problems with lying and stealing. Perry stated that the children had told her they had observed the mother in sexual behavior with various men and had witnessed the mother's abnormal sexual activity with objects and animals. The mother denied such activity. *287 Perry gave her opinion that both children were afraid of their parents. Perry stated that after parental visitation was limited and supervised, the children improved, both behaviorally and academically. She opined that it would be "potentially dangerous" to return the daughter to the father's home because the daughter had feelings for L.G.'s oldest child, a teenage boy.
The father has an extensive criminal history, with convictions for burglary, theft of property, theft of services, menacing, harassment, assault, possession of marijuana, and possession of drug paraphernalia. The mother has been convicted of criminal trespassing, contributing to the truancy of the children, and failure to have a child restraint in a vehicle.

I.
Citing Y.M. v. Jefferson County Department of Human Resources, 890 So.2d 103 (Ala.Civ.App.2003), affirmed, Ex parte State Department of Human Resources, 890 So.2d 114 (Ala.2004), the mother and the father contend that the juvenile court erred by admitting into evidence a 27-page report entitled "Court Report on Petition for the Termination of Parental Rights" ("the Court Report") prepared by DHR social worker Karen Cowart.
In Ex parte State Department of Human Resources, supra, the Alabama Supreme Court affirmed this court's holding that a parental-rights-termination hearing is an adjudicatory proceeding at which hearsay evidence, which is permitted by § 12-15-65(h), Ala.Code 1975, in a dispositional proceeding, is inadmissible. The court stated:
"[O]nly competent, material, and relevant evidence may be admitted during an adjudicatory proceeding to terminate a parent's rights. See § 12-15-65(f) and § 26-18-7(a), Ala.Code 1975. Additionally, we acknowledge, as did the Court of Civil Appeals, that hearsay evidence is not considered competent evidence in an adjudicatory proceeding, unless it falls within one of the exceptions provided by the Alabama Rules of Evidence, other rules adopted by this Court, or by statute."
Ex parte State Dep't of Human Res., 890 So.2d at 117 (footnote omitted).
The mother and the father objected to the admission of Cowart's report on the basis that it contained hearsay. The court overruled their objections, deciding that the report was admissible, pursuant to Rule 803(6), Ala. R. Evid., as a business-record exception to the hearsay rule. The parents argue that the Court Report does not qualify as a business record under Rule 803(6) because, they say, the report was prepared in anticipation of litigation. Rule 803 states, in pertinent part:
"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
". . . .
"(6). . . . A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
*288 The Advisory Committee's Notes to Rule 803(6) state:
"As a condition precedent to admissibility under this hearsay exception, the proponent must call a witness to lay the prescribed foundation. This is largely the same foundation applicable under pre-rules case law and includes testimony that the record was kept in the course of a regularly conducted business activity and that it was the regular practice of that business activity to make the record. See Ex parte Frith, 526 So.2d 880 (Ala.1987). There is no requirement that the authenticating witness be the custodian, entrant, or maker of the record. See Hammett v. State, 482 So.2d 1330, 1334 (Ala.Crim.App.1985). Not only must the record be relevant to regularly conducted business, but it must be shown that the generation of such a record is a regularly conducted activity of the business. It is this latter requirement that has caused caused to exclude certain records made solely in anticipation of, and in preparation for, pending litigation. See, e.g., United States v. Kim, 595 F.2d 755, 761 (D.C.Cir.1979)."
The rationale for the business-records exception to the hearsay rule is that reliability is assured because the maker of the record relies on the record in the regular course of business activities. See Ex parte Frith, 526 So.2d 880, 882 (Ala. 1987). The "regular course" of business "must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." Palmer v. Hoffman, 318 U.S. 109, 115, 63 S.Ct. 477, 87 L.Ed. 645 (1943). When an organization does not rely upon particular records for the performance of its functions, those records are not business records within the meaning of the Rule 803(6) exception to the hearsay rule. See Palmer v. Hoffman, 318 U.S. at 114, 63 S.Ct. 477 (holding that grade-crossing accident reports prepared by a railroad were not business records because they were not prepared "for the systematic conduct of the enterprise as a railroad business"; rather, "[the] reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading."). It is not enough to qualify under the business-records exception to show that the records are regularly prepared; instead, a court must evaluate "the character of the records and their earmarks of reliability ... acquired from their source and origin and the nature of their compilation." Palmer v. Hoffman, 318 U.S. at 114, 63 S.Ct. 477.
The issue whether a DHR court report qualifies under the business-records exception to the hearsay rule has not been decided in Alabama. However, the Minnesota Court of Appeals dealt with a similar issue in a termination-of-parental-rights proceeding in In re Child of Simon, 662 N.W.2d 155 (Minn.Ct.App.2003). In that case, the court held that it was error to admit a letter written by a child's therapist "`to update the district court' on [the therapist's] work with [the child]" because the letter was prepared in anticipation of litigation. 662 N.W.2d at 159. The court stated:
"[The therapist] wrote the ... letter expressly to update the court on [the child's] progress in therapy and to offer her recommendation for [the child's] placement. [The therapist] noted her understanding that the district court would be making a decision on permanency issues. Thus, [the therapist] clearly prepared the ... letter in anticipation of litigation, and the district court abused its discretion in admitting the letter."
662 N.W.2d at 161.
Likewise, we conclude that Rule 803(6) was not a basis for admitting the *289 Court Report in this case. Much of the information in the report (which, for the most part, spans a 10-year period, with some information extending as far back as 30 years to the mother's childhood) was not timely recorded. Rule 803(6) states that a business record will be admissible only if it is made "at or near the time" of the events it reports. See United States v. Kim, 595 F.2d 755, 760 (D.C.Cir.1979)(holding that a bank-deposit record, prepared two years after the deposit was allegedly made, was inadmissible under the business-records exception of Rule 803(6), Fed.R.Evid.). The title of Cowart's report, "Court Report on Petition for the Termination of Parental Rights," and the date of the report, six weeks before trial, demonstrate that the document was prepared in anticipation of litigation.
The statutory authority for the preparation and submission of court reports to the juvenile court is found in § 12-15-69(a), Ala.Code 1975, which provides:
"After a petition alleging ... dependency has been filed, the court may direct that a predisposition study and report to the court be made by ... [DHR] when the petition alleges that the child is dependent concerning the child, his family, his environment and other matters relevant to the need for treatment or disposition of the case."
(Emphasis added.) It is clear that the Legislature, by authorizing DHR to prepare and submit reports to the juvenile court on matters that are relevant to the "treatment or disposition" of a dependent child, did not intend to make such reports admissible at an adjudicatory proceeding to terminate a parent's rights. Although hearsay is admissible at the dispositional phase of a parental-rights-termination proceeding, it is not admissible during the adjudicatory phase. See § 12-15-65(f) and § 26-18-7(a), Ala.Code 1975; Y.M. v. Jefferson County Dep't of Human Res., 890 So.2d 103, affirmed, Ex parte State Dep't of Human Res., 890 So.2d 114. We conclude that the juvenile court erred by admitting the Court Report.
As to the mother, the admission of the Court Report was harmless error, however, because it was, for the most part, merely cumulative of the admissible evidence supporting the termination of the mother's parental rights. The admissible evidence against the mother was overwhelming and virtually undisputed. The Court Report included the following hearsay that was not cumulative of the legally admitted evidence: (1) a report from J.L.C. (a man to whom the mother was married for a short time in 1999 and by whom she had a third child whose custody is not at issue here) indicating that the mother had made death threats against him; (2) a report from the teacher of the parenting class that the mother attended indicating that the mother, who had had her tongue pierced, constantly pulled on her tongue and was disruptive in class; (3) a report from the maternal grandmother indicating that the mother "cursed the children `like a dog,'" and told the son that she would "knock his brains out." The maternal grandmother also reported that when the mother's third child, a toddler who is the children's half brother, "climb[ed] into the mother's lap, [the mother] knocked him to the floor."
Although the foregoing evidence was unfavorable to the mother, we cannot conclude that its admission warrants a reversal. The admissible evidence against the mother was simply so overwhelming that no rational fact-finder could have failed to rule in favor of DHR on its petition to terminate the mother's parental rights. See Winner Int'l Corp. v. Common Sense, Inc., 863 So.2d 1088, 1093 (Ala.2003)(indicating that the receipt of inadmissible evidence *290 against a party is not harmless error unless the admissible evidence against that party is "so overwhelming that the [finder of fact] had no choice but to rule in ... favor [of the adverse party]").
As to the father, the admission of the Court Report was also harmless error. The only information in the Court Report that was not otherwise elicited without objection at trial was the following: reports from neighbors indicating that, during the six-year period that the father had custody of the children, they "heard screaming and crying and banging from [the father's] trailer all the time" and that they "did not feel [the daughter] needed to be there." In light of other evidence, admitted without objection at trial, indicating that the father had committed physical violence against the daughter and that she was afraid of him, we conclude that the hearsay contained in the Court Report was cumulative of the legally admitted evidence against the father and did not prejudice the father's substantial rights. See Rule 45, Ala. R.App. P.

II.
Both parents argue that DHR failed to present clear and convincing evidence that their parental rights should be terminated. Section 26-18-7, Ala.Code 1975, sets out the statutory bases for terminating parental rights:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by [DHR] or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:

*291 "a. Murder or voluntary manslaughter of another child of that parent.
"b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
"c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term `serious bodily injury' means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
A trial court's decision in proceedings to terminate parental rights is presumed correct when it is based on ore tenus evidence, as it is here, and its decision will be set aside only if the record reveals the decision to be plainly and palpably wrong. M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004 (Ala.Civ.App. 1991). When the State is the petitioner in termination proceedings, the trial court must apply a two-pronged test in deciding whether to terminate parental rights. First, the court must find from clear and convincing evidence that there are grounds for the termination of parental rights, including, but not limited to, the grounds set out in § 26-18-7; second, the court must determine whether all viable alternatives to the termination of parental rights have been considered. Ex parte Beasley, 564 So.2d 950, 954-55 (Ala.1990); D.M.P. v. State Dep't of Human Res., 871 So.2d 77 (Ala.Civ.App.2003).

A. The Mother
DHR offered a number of services to the mother aimed at reuniting her with the children, but she failed to take advantage of any of those services except the parenting classes. The mother failed to establish even the rudiments of a responsible adult lifestyle, such as securing a home and a job. She made no progress towards bringing her drug problem under control; in fact, she apparently did not even consider her drug use to be a problem. The trial court was authorized to conclude from the evidence that, during the 25-month period that the children were in foster care, the mother failed even to acknowledge that she had any parenting deficiencies, much less to make progress towards remedying those deficiencies.
*292 DHR determined that there were no viable alternatives to termination of the mother's parental rights, and the mother does not contest that determination. The juvenile court concluded that DHR had established, by clear and convincing evidence, that the mother was unable or unwilling to discharge her responsibilities to the children and that her conduct or condition was unlikely to change in the foreseeable future. We hold that DHR clearly established grounds for terminating the mother's parental rights and the lack of any viable alternatives to termination. The trial court's determination that the mother was unable or unwilling to act as a parent and that her situation was unlikely to change in the foreseeable future is supported by clear and convincing evidence.

B. The Father
The father admittedly made much more progress towards achieving the goals set for him in the ISP than the mother did. He owns his own mobile home and has established a new and apparently stable family life with L.G. and her three children. He was continuously employed and earned an income sufficient to support a live-in girlfriend and her children.
With regard to one significant issue the father's drug usethe juvenile court could have considered, however, the father's acknowledgement that he had relapsed as recently as three or four months before trial. The court could also have weighed the fact that the father had blamed the daughter for a prior relapse into drug use, decided that attributing such blame to the daughter did not evidence an effort by the father to meet the needs of the daughter, and concluded that the father's blaming the daughter for his own failing was indicative of his inability or unwillingness to discharge his responsibilities to his children.
Moreover, the juvenile court could have determined that the father's efforts to comply with the requirements of the ISP were not aimed at "adjust[ing] his ... circumstances to meet the needs of [his] child[ren]," see § 26-18-7(b)(4), Ala.Code 1975, but were aimed, instead, at adjusting his circumstances to meet the needs of L.G. and her children. Despite the fact that he earned a decent wage and was continuously employed, the father evidently felt no obligation to support his biological children unless they were physically returned to his custody. When questioned about why L.G. did not work, the father responded, "She doesn't have to. I provide very well for my family, or her family." He also testified that he would have moved out of his mobile home if that action could have helped L.G. obtain custody of her children after DHR removed them.
When questioned about the time he asked the mother to take the children because he was having "mental stability" problems, the father responded that his instability was caused by "difficult times" with a former live-in girlfriend. He said he was "very stressed out, very irritable... it was devastating." He admitted that, although he had been drug- and alcohol-free for eight years up to that point, he began to smoke marijuana again during the break-up with that girlfriend.
In light of the foregoing evidence and the testimony from Dr. Wood regarding the father's narcissistic personality disorder, the juvenile court would have been authorized to find that the father's primary motivation for modifying his behavior was not an undergirding sense of responsibility for his children, but a need to gain the approval of, and thus to derive a sense of self-importance from, the current love interest in his life. Accordingly, the court could have determined that the continuation of the father's apparent positive *293 behavior modifications was dependent upon the stability of his relationship with L.G., and that that was too shaky a basis upon which to stake the children's future.
In any event, unlike the juvenile court, this court did not see and hear the witnesses testify. We hold that DHR presented clear and convincing evidence that there were grounds for the termination of the father's parental rights, see §§ 26-18-7(a)(2), (4), and (6), Ala.Code 1975, and that there was no viable alternative to termination. The father makes no argument regarding a viable alternative to termination of his parental rights.
The judgments of the Cullman Juvenile Court are affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs specially.
MURDOCK, Judge, concurring specially.
I agree with the conclusion reached in the main opinion that the "Court Report" at issue does not fall within the business records exception to the hearsay rule. The critical nature of what is at issue in a proceeding brought by the state to terminate the rights of a natural parent to his or her child compels me, however, to fully clarify for the sake of future cases my reasons for agreeing with this conclusion.
The main opinion emphasizes the fact that the court report was not admissible as a business record because it was made in anticipation of litigation. I agree. The main opinion also relies on the admittedly valid argument that the court report fails to satisfy the timely recordation requirement for the admission of "business records" under Rule 803(6), Ala. R. Evid. The main opinion also suggests that the court report was not admissible as a business record because its generation was not a regularly conducted activity of DHR. I write separately to explain my view that, because of the unique nature of the "business" of DHR, even if the record in question were one that was timely made and/or regularly generated by DHR, this would not necessarily prevent it from being a record made in anticipation of litigation and therefore from falling outside the intended scope of Rule 803(6), Ala. R. Evid.
In most businesses, a record that is prepared for trial or in anticipation of litigation will not be a record timely and regularly generated by that business; conversely, a record that is timely and regularly generated by a business typically is not one made in anticipation of litigation. The "business" of DHR, however, conflates these two circumstances. The business of DHR, as it relates to dependent children, is one that, by its very nature, anticipates litigation. As a result, the concern reflected in caselaw over the admissibility of records made in anticipation of litigation might exist as to DHR even in a case where the record at issue is one that is routinely and timely prepared. The observations and conclusions placed in such records may not have that "element of unusual reliability" contemplated by Rule 803(6) so as to justify their admission without the ability of an opposing party to confront and cross-examine the declarant. See Fed.R.Evid. 803(6), Advisory Committee's Note (also noting "a tendency unduly to emphasize a requirement of routineness and repetitiveness"); Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943) (addressing the admissibility of documents under the precursor to Rule 803(6), Fed.R.Evid., and noting that, although the conduct of a business may commonly entail the necessity of addressing tort claims, "the fact that a company makes a business out of recording its employees' *294 versions of their accidents does not put those statements in the class of records made `in the regular course' of the business within the meaning of the [rule]. If it did, then any law office in the land could follow the same course."); United States v. Blackburn, 992 F.2d 666, 670 (7th Cir.1993) (noting the difference in motives extant in employees' preparation of normal business records as opposed to employees' preparation of records in anticipation of litigation).
Though focused on the admissibility of an expert report, I find the analysis of the federal district court in W.D. Rubright Co. v. International Harvester Co., 358 F.Supp. 1388 (W.D.Pa.1973), to be instructive, particularly as it relates to the underlying rationale for the difference in our law's treatment of normal business records and records prepared in anticipation of litigation:
"The hearsay rule has one basic purpose. When a statement is offered for the truth of that statement, the rule insists that the maker be brought before the jury so that it can evaluate his credibility and thereby gauge the truth of the statement itself. All the exceptions to the hearsay rule are based on the belief that something about the out-of-court statement insures or tends to insure its truthfulness, and therefore the jury need not evaluate the maker's demeanor for signs of credibility. The Business Records exception to the hearsay rule is in keeping with this theory of inherent believability. Giant businesses involve many departments which must interact as well as deal with outsiders over long periods of time. Precise communication and accurate records are extremely important if these interactions are to succeed. A company cannot lie to itself on a day-to-day basis and survive because business records serve as the corporation's memory.

"So it follows that records made in the ordinary course of a company's business will be truthful. On the other hand, if records are made with the thought of using them at trial, they will not necessarily have the truthfulness inherent in the day-to-day records that are made in the ordinary course of business. Without this inherent believability, the jury should be permitted to view the demeanor of the maker in order to measure his credibility. The Pittsburgh Testing Laboratory reports do not qualify as business records because they were prepared specially for trial. As in this case, when expert reports are prepared at the behest of a party involved in litigation, it creates the possibility that an overzealous expert might abandon the impartial objectivity that is usually attributed to men of science or specialized learning, and move toward the role of an advocate. The right of cross-examination is the only effective means of dealing with this possibility."
W.D. Rubright Co. v. International Harvester Co., 358 F.Supp. at 1403 (emphasis added). See generally United States v. Jacoby, 955 F.2d 1527 (11th Cir.1992) (noting that "unusual reliability," and not routineness or repetitiveness, is the touchstone of admissibility under the business records exception).
Both the mother and the father also argue that the court report in this case was characterized by what is often referred to as "hearsay within hearsay." In other words, the mother and the father find fault with the fact that much of the information contained in the court report was provided by individuals who were not employees of DHR. In my view, this argument also is well-taken.
*295 The requirement in Rule 803(6) that the document be prepared "by, or from information transmitted by, a person with knowledge" was designed to ensure that the persons providing the information share the same business purpose and motivation for accuracy as does the direct preparer of the document. Thus, a report is not admissible under Rule 803(6) if the information at issue has been "supplied by a non-employee or outsider." Charles W. Gamble, Gamble's Alabama Rules of Evidence § 803(6) n. 11 (2d ed. Supp.2003) (citing, inter alia, James v. State, 723 So.2d 776 (Ala.Crim.App.1998)). As the Ninth Circuit Court of Appeals has aptly put it:
"[H]earsay statements are admissible only if the observer or participant in furnishing the information to be recorded was `acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business."'"
Clark v. City of Los Angeles, 650 F.2d 1033, 1037 (9th Cir.1981) (quoting United States v. Pitman, 475 F.2d 1335 (9th Cir. 1973)). See Reeves v. King, 534 So.2d 1107, 1111 (Ala.1988) (noting that, ordinarily, the reports of an investigating police officers are not admissible in evidence and that mere routineness is not a sufficient guarantee of reliability, reasoning that "`[t]he mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves'" (quoting Yates v. Bair Transp., Inc., 249 F.Supp. 681, 683 (S.D.N.Y.1965))).[2]
NOTES
[1] This arrest resulted in the father's pleading guilty in 2003 to unlawful possession of drug paraphernalia. For that offense, he was given a 12-month suspended sentence with 24 months on unsupervised probation. The charge for the firearm offense was apparently dropped.
[2] This appeal does not present questions even more fundamental than those discussed in this writing as to whether various types of reports prepared by DHR would be considered business records for purposes of Rule 803(6), Ala. R. Evid. See Nat Stern & Karen Oehme, The Troubling Admission of Supervised Visitation Records in Custody Proceedings, 75 Temple L.Rev. 271, 292-98 (2002) (noting that there can be no "routine" parent-child encounter at a visitation and that "each is a unique event whose dynamic the author of an observation report seeks to capture in an inevitably subjective manner"). See also Y.M. v. Jefferson County Dep't of Human Res., 890 So.2d 103, 118 (Ala.Civ.App.2003) (plurality opinion) (agreeing with the assertion of the Jefferson County Department of Human resources that "the practical effect" of hearsay not being admissible in an adjudicatory proceeding to terminate parental rights would be "that the case would be reheard from the initial contact with the parent through the date of the hearing on the termination petition, resulting in the presentation of evidence previously submitted to the court in prior hearings. Testimony would have to be provided by each social worker, counselor, medical doctor or other professional that had ever dealt with the case, if they could be located.'").